## STATE ex rel. PAGE v. SMITH et als.*

*Quo Warranto. Practice. Corporation. Subscription to Capital Stock. Merger. Power of Directors. Ratification.*

When leave is granted to file an information in the nature of a writ of *quo warranto*, it is the duty of the court to fix some time, ordinarily during the same term, for the respondents to appear and plead; and if they do not voluntarily do so, their appearance will be compelled by due process of law.

A petition for leave to file such an information, is addressed to the judicial discretion of the court. It may be allowed or disallowed, in consideration of the rights and consequences, the conditions of the property and its owners, and its relation to the public.

If one subscribe to the capital stock of a corporation for and in the name of another without authority, he thereby binds himself, and becomes the equitable owner of the stock. A transfer thereof from the person in whose name the subscription is made, is not necessary—it is sufficient if the stock be carried to the account of the subscriber on the stock ledger of the company.

The fact of merger depends largely on intention, and this rule applies to a case where a corporation purchases shares of its own stock. The purchase suspends the right to vote on the stock, and may or may not have the effect of a merger, at the option of the company. Some manifestation of such intent should be proved, to produce that result.

A minority of the directors of a corporation, although legally assembled pursuant to call, cannot lawfully adjourn the meeting to a place at considerable distance—in this case fifty miles.

By express statute, a quorum of the directors of a railroad corporation are competent to act within the scope of their authority, and to bind the corporation, although the meeting be not regularly called, and no notice given to the other directors.

If a member of a corporation who is also an associate director claims that the other directors, as agents of the corporation, have exceeded their functions in selling property in derogation of the rights of the corporation, that claim must be seasonably asserted in a manner that will bind the parties to such sale. Acquiescence will confirm the sale; and allowing the consideration to be applied to the use of the corporation, will adopt and ratify it; and the purchaser must be a party to such a proceeding.

When new stock is issued that is to share in profits with existing stock, all holders of the latter have an equal right to subscribe for their proportionate part of the new stock; but this rule does not apply to original stock bought in by the corporation and held as assets, and sold for the payment of liabilities, or for the general benefit.

If a sale of stock by a corporation is otherwise valid, it is not vitiated by the fact that the motive of some of the directors and of the purchaser, was, to enable the latter to vote upon the stock in a certain manner at an approaching election of directors.

THIS was a petition by the state's attorney of Franklin County, upon the relation of John B. Page, for leave to file an informa-

---

* S. C., *ante* 14.

tion in the nature of a writ of *quo warranto* against the respondents for usurping and exercising the office of directors of the Central Vermont R. R. Co.

Said company was incorporated by act of the Legislature, approved Nov. 23, 1872, for the purpose of purchasing the Vermot Central and Vermont & Canada Railroads, or either of them, and of purchasing or retiring, by exchange or otherwise, the stock and bonds of the Vermont Central and the Vermont & Canada Railroad companies, and of operating and maintaining said roads, and for other purposes set forth in said act. Said act provided that the capital stock of said first-mentioned company should be an amount sufficient to purchase or retire the first and second mortgage bonds of the Vt. Central Railroad, such amount to be determined by the directors of the company, and such additional amount as might be authorized by a majority vote of the stockholders. On April 30, 1873, cash subscriptions to the capital stock of said company, to the amount of $2,000,000, were made, and 5 per cent. on the whole 20,000 shares paid in by T. W. Park, a large subscriber to said stock ; whereupon, on May 27, 1873, said company was duly organized, and on application for that purpose, and due representation that its capital stock had been subscribed for to the amount aforesaid, the Court of Chancery appointed said company receiver of the Vt. Central and the Vt. & Canada Railroads. Among the subscriptions were 2400 shares standing as follows : 1000 in the name of one Meyer, and 500 in the name of one McKinney, made by said Park by duplicating their authorized subscriptions by mistake. There were also 50 shares standing in the name of one Chaffee, subscribed for by J. G. Smith, as Chaffee claimed, without authority. Eight hundred other shares stood in the names of various persons who wished to be relieved of their subscriptions ; and 50 shares stood in the name of one Coffin, subscribed for by said Smith, and Coffin claimed that he had paid for them in services for the company, and therefore refused to pay cash on his subscription. Counsel advised the company that none of these subscriptions could be cancelled, but that the company could purchase the stock. Accordingly, at a meeting held on January 16, 1874,

the directors voted to authorize the treasurer to purchase stock of the company to an amount not exceeding $250,000, paying therefor a rate not exceeding five per centum of the par value thereof. No assessments were paid on said stock, and no scrip stock certificates issued therefor. Park assumed the subscriptions that he made for Meyer and McKinney by mistake, and they were entered to him on the stock ledger of the company on July 1, 1873, never having been so entered to Meyer and McKinney; and Park transferred said stock to the company, and the company reimbursed him the 5 per cent. he had paid thereon. Meyer and McKinney never formally assigned said stock to Park, and whatever title he acquired thereto, was in the manner aforesaid. Said 800 shares were entered upon the stock ledger, to the various subscribers therefor, and were transferred to the company, and the company reimbursed Park for the 5 per cent. paid thereon, and on the 50 shares standing in the name of Chaffee. Chaffee at first refused to assign to the company the 50 shares standing in his name, because he repudiated the subscription; but he has formally assigned them since the commencement of this proceeding. Said shares were entered to him in the stock ledger. Thus the company became the owner of 2350 shares, and the same were transferred to the company in the stock ledger, on February 2, 1874, and the accounts with the various subscribers closed. The first transfer book the company ever had, was opened the latter part of April, 1874. Prior to that time, Duncan, Sherman & Co., the company's transfer agents in New York, had a book in which they kept an account with the various stockholders. The treasurer of the company kept a stock ledger after April 25, 1874, for the purpose of showing how many shares of the capital stock of the company stood in the name of each stockholder; and on May 19, 1875, said ledger showed that the company owned 2350 shares of said stock, and had, as some of the testimony tended to show, since February, 1874. By resolution of February 25, 1875, the capital stock of the company was fixed by the directors at 10,000 shares, being $1,000,000, that being an amount sufficient to purchase the first and second bonds of the Vt. Central Railroad Company, reducing two shares of half-paid to one full-paid share.

The by-laws of the company provided, that

Meetings of the board of directors may be called at any time and place, by the president or the vice president of the company, and must be called by them whenever requested to do so in writing by any three members of the board; and in their absence or inability, the same may be called by the clerk.    *    *    *    Directors shall be notified in writing, of the time and place of all meetings of the board, except adjourned meetings, a reasonable time beforehand.    *    *    *    The clerk shall, under the direction of the president or vice president, give all notices required for the election of directors, of meeting of directors and committees.    *    *    *    All transfers of stock shall be made in the usual way, by the stockholder signing in person or by attorney, in a book kept for that purpose, a declaration of the sale or transfer, setting forth the number of shares, &c.

On Saturday, May 15, 1875, Hoyt, a director of said company, resident in New York City, telegraphed to J. G. Smith, the president of said company, resident at St. Albans, that the relator, another director of said company, resident at Rutland, and his friends, were attempting to buy up the stock of the company in New York, in violation, as it was claimed, of certain stipulations between said Page and Smith.    At this time, a meeting of the directors of said company stood called to meet at St. Albans on the 19th of said May, at 11 o'clock, A. M., and a stockholders' meeting for the election of directors, at 12, M. of the same day.

On May 17, 1875, the clerk of said company telegraphed several of the directors from So. Royalton, Vt., that a meeting of the directors of the company would be held the next day, at half-past one, P. M., at the depot at Bellows Falls.    Some of the directors did not receive the telegram in season to enable them to attend the meeting, whereof the president was advised by telegraph, protesting that the notice was unreasonably short, and some could not attend on account of other business, and so there was not a quorum present at the meeting, there being only six present, and the whole board consisting of thirteen; and for the purpose of obtaining a quorum, and, as it was claimed, in good faith, the meeting was adjourned to meet that afternoon on board the directors' car, wherein the directors were returning to St. Albans from an

inspection of their roads.    This car was built expressly for use by
the directors, and some of the testimony tended to show that the
directors had frequently held meetings and transacted important
business in it while passing over the road;   while other of the
testimony tended to show the contrary.    Another director came
aboard said car at Windsor, so a quorum was present, and soon
after said car left White River Junction, the president of the com-
pany called the meeting to order pursuant to adjournment, the
clerk being present, and stated the object to be, to raise money to
meet a liability to the Vt. & Canada on the first of June then
next, and also to liquidate some claims of the Vt. Valley R. R.,
that company having threatened to take forcible possession of said
road if not paid ; and thereupon a resolution was passed, authoriz-
ing the president to borrow money on pledge of any stock, bonds,
securities, or other assets belonging to the company ;  or to sell
stock, credits, or assets, according to his judgment and that of two
of the finance committee.    Inspectors of elections were also chosen
from among the number present.    The testimony was conflicting
as to whether the company had ever regarded said 2350 as assets
of the company or not.

On May 19th, the board of directors was not called together,
no quorum being present at any one time in the room where the
meeting was called.    On that day, before the stockholders' meet-
ing for the election of directors, the president, with the approval
of one of the finance committee besides himself, transferred on the
books of the company, 1750 of said 2350 shares, to James R.
Langdon, a director and stockholder of the company, as collateral
security for a loan then made, with the right to purchase and to vote
upon the stock ; but before the election, said Langdon purchased said
stock absolutely, as the testimony tended to show, but no certifi-
cate thereof was issued to him till some days after.    Langdon tes-
tified that he made his purchase thereof absolute, because he
thought his right to vote thereon would be more unquestionable.
The remaining 600 of said shares, were then, in like manner,
transferred to one Millis, a stockholder and employee of the com
pany.    Each of them paid for said stock, and the money was used

by the company for the payment of its debts, but not said demand to the Vt. & Canada, as that did not come upon the company as was anticipated.

The president of the company, on the morning of the said 19th of May, and before the election of directors, transferred 2000 shares of his own stock to his son, Geo. G. Smith, and 250 shares to his brother, W. C. Smith. The relator protested in stockholders' meeting of that day, against said Langdon's and Millis's voting on the stock thus transferred to them, claiming that the tranfers were fraudulent and void ; but they were allowed to and did vote thereon, casting their votes for the respondents, who were declared elected directors, as was also the relator. Without the votes of said Langdon and Millis cast upon said 2350 shares, the respondents would not have been elected. The inspectors appointed on the car the day before, acted as such at said election.

All other necessary facts are stated in the opinion, and in the briefs of counsel.

*Daniel Roberts* (*E. R. Hoar* with him), for the relator.

I. The defendants' right may be tried upon this rule to show cause. By Gen. Sts. c. 30, s. 11, power is given to the Supreme Court " to issue and determine all writs of error, *certiorari*, *mandamus*, prohibition, and *quo warranto*, and all other writs and processes to courts of inferior jurisdiction, to corporations and individuals, that shall be necessary to the furtherance of justice, and the regular execution of the laws,"—and this is the only statute provision upon the subject. In lack of any prescribed mode of proceeding in such cases, the court is left free to adopt such a mode as shall give effect to these remedies, and, as far as the common law is a guide, to mould that to our situation and circumstances. The common law furnishes almost no guide for such proceedings in this state. Thus, the statute speaks only of a *writ* of *quo warranto*. But such a writ had been obsolete in England for hundreds of years before this statute was enacted. It is only by construction, then, that the Supreme Court is given jurisdiction of an information in the nature of a *quo warranto*, and by treating it as *a writ. State* v. *West Wisconsin R. Co.* 34

Wis.; High, s. 610, note. But though both the writ and the information existed at common law, yet both were prerogative remedies for the usurpation of some prerogative of the crown, and were never used as a remedy for private citizens desiring to test the title of persons claiming to exercise a public franchise. High, ss. 592, 602. An information for this latter purpose, owes its origin to the statute of 9 Anne, c. 20, (1711); Ib. s. 602. The judicial system of this state is such as to demand a self-ordained system of practice in such cases, in order to render the remedy of any value.

As to writs of *certiorari, mandamus,* and *quo warranto* informations, they have been treated alike in these respects: 1, as instituted by way of petition, setting forth the facts claimed, and praying for the writ; 2, sustained by evidence taken in advance of the hearing by affidavit upon notice; 3, as depending upon the discretion of the court whether to grant the writ, or to allow the information to be filed; and 4, determining the ultimate right upon hearing of the rule to show cause. Cases of *certiorari: Royalton* v. *Fox,* 5 Vt. 458; *West River Bridge Co.* v. *Dix,* 16 Vt. 446; *Pomfret* v. *Hartford,* 42 Vt. 134.

*Certiorari* changed to *mandamus,* and ordered to issue peremptorily at same term: *Woodstock* v. *Gallup,* 28 Vt. 587, 591. *Mandamus:* " The hearing being had upon the rule to show cause, *as is common,* the writ of *mandamus* will issue in the peremptory form in the first instance," &c. *Walter* v. *Belding,* 24 Vt. 658. *Quo warranto: State* v. *Fisher,* 28 Vt. 714.

In every *quo-warranto* case reported in this state, the right was determined upon the rule to show cause, at the same term. *State* v. *Essex Bank,* 8 Vt. 433; *State* v. *Boston, &c., R. Co.* 25 Vt. 433; *State* v. *Hunton,* 28 Vt. 594; *State* v. *Bradford,* 32 Vt. 50. In the last case, the judgment of ouster was rendered as the legal result of the leave granted to file the information.

Clearly, it is competent for the defendants in a *quo warranto,* to show cause why leave should not be granted to file an information, by setting forth and proving their title to the office, where, as in this case, due notice of the application has been given, and an order for the taking of the testimony on both sides has been

made. Such title being shown, the court would deny the motion and dismiss the petition. It is therefore wholly unnecessary for the defendants' protection, that the trial of the right should be postponed for an issue and trial upon the information. The course pursued in cases of *certiorari* and *mandamus*, and uniformly practiced in *quo-warranto* informations in this state, should be treated as settled for the latter case. Formal pleadings and issues, and double hearings, are needless, if not absurd, under our system.

II. As to the 2350 shares, as stock. The better judgment would seem to be, that these shares never had existence as part of the capital stock ; or if so in idea, that they became merged and lost. Fifteen hundred and fifty of these had been subscribed for in the names of parties who gave no authority for the subscriptions, and never afterwards recognized them. These subscriptions so made by Park and Smith, did not make them stockholders or members of the corporation. *Salem Milldam Co.* v. *Ropes*, 9 Pick. 187. As to all the 2350 shares, no assessments had been paid upon them, nor scrip stock certificates issued to them, nor anything paid upon them except the 5 per cent. advanced in gross by Park, with the expectation of being reimbursed. When, therefore, this 5 per cent. was paid back to Park, it was the very money he had put in on account of capital, and the repayment left matters as if nothing had been paid in. You have left, then, only certain unpaid subscriptions for shares, without capital corresponding.

The transfer of its own stock to a corporation, unless there is some provision in the charter to the contrary, operates as a merger of the stock. *Williams* v. *Savage Mnfg. Co.*, 3 Md. Ch. Decis. 418. But, here being only a subscription to be transferred, the transfer to the corporation operated necessarily to cancel the obligation to pay, and these so-called shares ceased to be. If anything was conveyed, it was only an obligation to take and pay for shares, which obligation the corporation assumed to itself—an idle thing. It need not be disputed that in security or as payment of a debt, a corporation may receive a transfer of its own stock, and that in such case, if so understood and intended, it may be revived or

35

kept on foot for re-issue. *Williams* v. *Savage Mnfg. Co.*, *supra*; *City Bank* v. *Bruce*, 17 N. Y. 507. But a corporation cannot be allowed to go into the market to purchase, or to deal in, its own stock. Brice Ultra Vires, 98–9 ; *Benton* v. *Plank Road Co.* 17 Barb. 397. It is a breach of trust in the directors so to do. *In re London R. Co.* 13 Eng. L. & Eq. 201 ; Ang. & Ames Corp. s. 159.

The intent of this transaction was merely to release the subscribers to the 2350 shares. The mode of effecting this was but matter of form, and the apparent ownership of these shares by the corporation upon the stock ledger, was but a matter of bookkeeping. The effect was to reduce the actual stock to 17,650 shares. The resolution of Feb'y 25, 1875, reducing the stock to 10,000 shares, by the mode pointed out for such reduction, necessarily excludes these 2350 shares, for there was no " present stockholder of the company " to represent them who could surrender a certificate of two shares of half-paid stock, and take a certificate of one share of full-paid stock.

But a determination of these questions is not essential to the case in hand. Whether we regard these shares as existing for the purpose of sale or issue, or whether there existed in the corporation a right to make up the deficit by the issue of new shares by new subscription or sale, this property or right belonged to the individual stockholders who constituted the corporation, to each in proportion to his interest, and could be disposed of only for their equal proportionate benefit, giving them the first right to take the stock. Ang. & Ames Corp. ss. 554, 555, 556, 557, and note ; *Reese* v. *Bank of Montgomery Co.* 31 Penn. St. 78 ; *Gray* v. *Portland Bank*, 3 Mass. 364.

These defendants, as directors of the corporation, stood as trustees of the stockholders, and could not secure to themselves advantages by the disposition of these shares, not common to all the stockholders. The law of trusts applies in such case. *Kochlen* v. *Black River etc. Co.* 2 Black., (U. S.) 715 ; *European etc. R. Co.* v. *Poor*, 59 Maine, 277 ; *Verplank* v. *Mercantile Ins. Co.* 1 Edw. Ch. 84 ; *Cumberland etc. Co.* v. *Sherman*, 30 Barb. 553.

These shares, standing in the name of the corporation, or if

owned by the corporation, could not be voted upon ; nor could these directors, especially as representing but a minority of the stockholders, in any way or by any contrivance, wield them for the purposes of an election, and more especially to keep themselves in place. *Ex. parte Holmes,* 5 Cow. 435 ; *ex parte Desdoity,* 1 Wend. 98 ; *American Railway Frog Co.* v. *Haven,* 101 Mass. 398 ; *Brewster* v. *Hartley,* 37 Cal. 15, 24 ; *Northern R. Co.* v. *Concord R. Co.,* and *Fisher* v. *Same,* 50 N. H. 166 ; *Campbell* v. *Poultney,* 6 Gill & J. 94. The controlling purpose of the defendants in this respect being unlawful, though these were lawful shares, the transfer to Langdon, a director, and to Millis, both sharers in the unlawful purpose, conveyed to them no right to vote upon the shares.

III. As to the meeting of May 18th. The notice issued by telegraph, and purporting only to be signed by the clerk, hardly bore the authenticity required by the by-laws, that it should be " in writing," and " under the direction of the president or vice president." Ang. & Ames Corp. s. 491. By the by-laws, the clerk has no authority to " call " a meeting, except in the absence or inability of the president or vice president. He can give "notices" of meetings only by direction of the president or vice president. Such direction should appear upon the notice given. *School District* v. *Atherton,* 12 Met. 105 ; *Stone* v. *School District,* 8 Cush. 592. Such a message it was safe to disregard.

The notice was not given "a reasonable time beforehand," as required by the by-laws. Ang. & Ames Corp. s. 494. To be reasonable, it should be given at such time in advance of the meeting, as that the party notified may accommodate his business so as to be able to attend. The purpose and business of the meeting was not disclosed in the notice. The purpose being for something other than the transaction of " ordinary business," it should have been indicated in the notice. Ang. & Ames Corp. ss. 488, 489, 496, n. ; *People's Ins. Co.* v. *Westcott,* 14 Gray, 440.

The gathering at Bellows Falls was no meeting of the board of directors. No quorum being present, it was as no meeting, and no business could be done. Ang & Ames Corp. s. 501 ; *ex parte Wilcocks,* 7 Cow. 402. Those present had no power even to ad-

journ as a formal and binding act, though doubtless they might have awaited a reasonable time the arrival of others to constitute a quorum, though not to adjourn to another place so as to form a legal assembly of the board there. The adjourned meeting, therefore, must partake of the character of the meeting at Bellows Falls, and all the proceedings of that gathering on the cars were necessarily void. The place of the actual pretended meeting was more than unreasonable ; it was to six of the directors an impossible place. Ang. & Ames Corp. s. 496.

The resolution pretended to have been passed on the cars, contained alternative provisions, either to borrow money and pledge assets, or to sell assets ; but in either case this was to be done only upon the combined judgment of the president and two of the financial committee. The authority of the president to transfer such assets, rests wholly upon the power given him by this resolution, and unless strictly pursued, his attempted transfer must fail for lack of power to make it ; the conditions which support the act failing, the act must fail.

IV. The attempted transfer of the 2350 shares.

The character of these transfers must be determined by the written instrument of transfer alone ;—1st, by force of the rule that a written contract cannot be varied or added to by parol, and that a writing is the superior evidence ; and 2d, because by the by-laws, all transfers of stock must be made by the stockholder signing in a book provided for that purpose, a declaration of sale or transfer. In making these transfers, the president adopted the first alternative of the resolution of the 18th May, viz : as collateral security for money loaned, "as collateral security, with right to purchase, and with power to vote on and represent said stock," &c. Clearly, this hypothecation of the shares carried no right to the pledgee to vote upon them, nor could such power be conveyed with such pledge. In case of a hypothecation of stock, expressed on the transfer book, the right to vote is in the pledger. *Ex parte Wilcocks*, 7 Cow. 402 ; Ang. & Ames Corp. s. 132. But here, the pledger was the corporation, and the corporation had not the power to vote on these shares, and consequently could not convey such right by a pledge, nor give a proxy. Moreover, the resolu-

tion of the 18th May gave no authority to the president to convey the power of voting *per se*.

The transfer did not pursue the authority given in respect to the approval by two members of the financial committee. The resolution required the approval of two of the committee *beside* the president. He secured the approval of but one, himself undertaking to act in a double capacity. If it be said that Langdon approved by becoming the transferee, this he could not do, being as director and one of the financial committee, a trustee, and so not competent to approve a sale to himself.

V. The election.

The meeting on the cars not being a valid meeting of the board of directors, it follows that the inspectors of election there appointed, had no authority to act. The called meeting of the directors for the 19th of May not having been held, and no inspectors appointed, the appointment of inspectors and the conduct of the election, devolved upon the constituent voting body, the stockholders. *Commonwealth* v. *Wodper*, 3 S. & R. 29; Ang. & Ames Corp. s. 351. The motion for the appointment of inspectors by the stockholders, was ruled out of order by the president, and an appeal refused. Against protest, the inspectors proceeded to take the votes, and by counting the votes cast upon the 2350 shares for the defendants, they were declared elected, and they have since acted as such. It is not claimed that the election was invalidated thereby, so as to render it void, for we have proof of the actual vote given, and upon what shares the votes were cast. The fact is material only as bearing upon the motive and the fairness of the proceeding.

VI. This whole transaction is so characterized by secrecy, trick, conspiracy, and fraud, that to allow it to prevail, would be to allow the law to be "outwitted by cunning devices." *State ex rel. Danforth* v. *Hunton, et al.* 28 Vt. 594. All acts done by a portion of the stockholders in an election, which have the appearance of trick, secrecy, or fraud, are invalid; and suprise and fraud in respect to another portion of the stockholders, is ground for avoiding an election. *People* v. *Albany &c. R. Co.* 55 Barb. 344; *Rex* v. *May*, 5 Bur. 2681; Ang. & Ames Corp. s. 496.

The morning of the 19th, the stock was transferred on the transfer book to Langdon, in the first instance as collateral, with right to purchase and the right to vote, but before the election, was converted into an absolute purchase; and the same is true of Millis; and certificates absolute on their face were made out to each of them at the time, and the $117,500 paid has been appropriated to the use of the company, and so the company have ratified the sale.

*B. F. Fifield* and *Levi Underwood* (*L. P. Poland* with them), for respondents.

1. A corporation may become the purchaser of its own stock, and the reasons for so doing are in the discretion of the directors, provided they act in good faith. Having been bought, it is both their right and their duty to sell again, and so keep the capital good. *City Bank of Columbus* v. *Bruce et al.* 17 N. Y. 507; 3 Blatchf. 433; *Williams* v. *Savage Mf'g. Co.* 3 Maryland Ch. Decis. 451; *Robinson* v. *Beall*, 26 Ga. 28; *Taylor* v. *Miami Exporting Co.* 6 Ohio, 219; *U. S. Trust Co.* v. *Harris*, 2 Bosw. 90. *City Bank of Columbus* v. *Bruce et al.* is exactly in point.

2. A good title was transferred to the company. The by-laws requiring transfers to be made on a transfer book "to be provided for that purpose," had no application, because the company had no transfer books for months after this purchase. 31 Law & Eq. 58; 13 Beav. 162. The stock was, in fact, transferred and entered upon the stock ledger at the time, which, as between the transferrer and the company, was enough. The object of a transfer book is notice, like a registry of deeds. 2 Cow. 777; 3 How. 483; 8 Pick. 90. A copy of the stock ledger, which is the only authentic registry, showing 2350 shares owned by the company, was given Page as early as May, 1874. Transfer books are nugatory until there are certificates issued which are surrendered when transfer is made. Before stock is paid up, sales are made only by the assent of the directors, which was always the practice of this company. The court will look beyond the books, and inquire where the real ownership is, for the purpose of determining who may vote. *Danforth* v. *Hunton et al.* 28 Vt. 594.

3. Smith, Rice, and Langdon, were each members of the finance committee. The sale was with the approval of two of these, Rice and Smith, which was all that was required by the vote. Smith was not disqualified from acting as one of the finance committee because he was president and made the sale; he had no interest. Langdon was interested, but even his interest was not a necessary disqualification. If he acted in good faith in executing the vote of the company, that is enough. But the assent of two was enough. *Stark Bank* v. *U. S. Pottery Co.* 34 Vt 144.

4. There was no right of pre-emption to this stock in the other stockholders. That right applies only to an enlargement of capital stock. If there was such right, it could not be asserted in this proceeding. 3 Md. Ch. Decis. 418.

5. · The sale was in good faith, to raise money for the Vermont & Canada. Even if there was another incidental motive, it is of no consequence. The motive with which a legal act is done is immaterial. *South Royalton Bank* v. *Suffolk Bank*, 27 Vt. 505.

6. The charter provides each share shall entitle the holder thereof to one vote. The charter is not made subject to general legislation. So far, then, as the charter is inconsistent with the general law, it must be treated as an exception to it. The general · law, therefore, providing no stockholder shall vote upon more than one tenth of the capital stock, has no application to this company. Its charter is its own law on that subject. Gen. Sts. 217.

7. The vote of the directors reducing the capital stock was never acted upon by anybody, and was repealed by subsequent vote of the directors.

8. The meeting of the 18th of May was called and held according to the by-laws. The time was reasonable. The notice by telegraph was a notice in writing, and it was according to the usage of the company. The adjournment to get a quorum was according to the prior custom of the company, and also of other companies. Less than a quorum may adjourn *to a subsequent time.* 44 N. H. 467. The meeting was not called to meet on the cars. It was called at a definite time and place, and then adjourned for convenience and from necessity, to *another place.* 8

Cow. 286 ; 1 Seld. 22. No director attended at Bellows Falls after the adjournment, so that no one was disappointed. The adjournment was to meet in a car which had been built expressly to hold directors' meetings in, which implies a general understanding of the directors that they might be so held, and as in fact they had been so held before that time.

9. But if there was any irregularity in the call and adjournment of the meeting, it would make no difference. This was an annual trip for the inspection of the roads, to which all had been invited, and when by custom and common understanding the meeting was considered open all the time for the transaction of business. Under such circumstances, the assent in fact of a majority of the directors will bind the corporation, though the others are not notified or consulted at all. *Bank of Middlebury* v. *R. & W. R. R. Co.* 30 Vt. 169. The corporation has ratified the sale by appropriating the proceeds to its own use, to wit, $117,500. *Bank of Middlebury* v. *R. & W. R. R. Co.*, *ante.*

10. On motion for leave to file an information, whether such leave shall be granted is in the discretion of the court, and on that question the court will consider the motives of the relator, the nearness of another election, the public and private inconvenience, and the expense that may follow. High, 436–7 ; *People* v. *Waite*, Chicago Legal News, 175 ; *State* v. *Fisher*, 28 Vt. 714. Another election occurs in May. *State* v. *Fisher*, *ante ;* *Commonwealth* v. *Athearn*, 3 Mass. 285 ; *People* v. *Sweeting*, 2 Johns. 184.

Even if this was a final hearing on the information, the court could not induct the Page board. It could only order a new election. High, 491 ; *State* v. *McDaniel*, 22 Ohio, 354 ; *People* v. *Connor*, 13 Mich. 238. If the information is filed, the defendants are entitled to time to plead, and be heard in the formal and usual mode known in courts of justice ; and before a trial can be had, a new election will take place. They are not now in court for the purposes of the information, but only on the motion to show cause why an information should not be filed. High, 533 ; 5 Binney, 353 ; 5 Ohio, 250 ; 44 Ill. 458 ; 12 Penn. 365 ; *Common-*

*wealth* v. *Athearn, ante ; People* v. *Sweeting, ante ; People* v. *Richardson,* 4 Cow. 97.

The opinion of the court was delivered by

REDFIELD, J.   This is a petition of the state's attorney for this county, for leave to file an information in the nature of a writ of *quo warranto* against the respondents for usurping and exercising the rights of directors of the Central Vermont Railroad.   A rule to show cause having been obtained and served on the respondents, the question now comes up whether this court will grant the leave asked.   A preliminary question has been discussed, whether, if insufficient cause be shown and leave is granted, a judgment of ouster will be awarded as a matter of right or as a matter of course.   It is not denied that at the time our statute was enacted, and down to the present time, the practice was settled and uniform in the courts of England, that after leave was granted and the information filed, the respondents had time and opportunity to plead to the information.   The nature of the application is summary, and requires speed ; and the court will see to it that there be no useless delay.   The 4th sec. of the statute of Anne, required " proceeding at the most convenient speed that may be," and "an appearance and pleading as of the same term at which the information shall be filed."   But the practice in the English courts, under that statute, was, when the information was filed, if there was not voluntary appearance, to require such appearance by *venire facias* or compel it by *distringas.*   The rule requires the respondents to *show cause* why an information should not be filed against them : if they omit to show cause, as they may, the rule becomes absolute, and the information is filed.   In *The People* v. *Robinson,* 4 Cow. 97, the respondent had been adjudged guilty upon default of appearance to show cause, and ouster awarded.   The court held the judgment irregular, and without due process of law, and set it aside, as irregular and void.   It is noticeable as having been ably argued by the attorney general on the one side, and John C. Spencer on the other, and thoroughly sifted by the court.   We think, when an information is allowed to be filed, it is the duty of the court to fix some time, ordinarily

36

during the same term, for the respondents to appear and plead; and if they do not voluntarily do so, their appearance will be compelled by due process of law. In *State* v. *Hunton et al.* 28 Vt. 594, the court, BENNETT, J., questioned the propriety of rendering final judgment of the guilt or innocence of a party on a rule to show cause why an information should not be filed; and maintained that the rule of practice was otherwise, unless the court should, of its own motion, institute a new and independent practice of its own. But in that case, no question was raised, and by mutual consent the parties submitted the whole case upon its merits. In *Hale* v. *Bradford,* 32 Vt. 50, the respondents disclaimed any right or title to the offices in question; and the pretended and *de-facto* corporation appeared, but made no answer, and asked to have the case decided upon the proofs of the state's attorney. There was no relator upon the record, as the court said should have been. The proof being ample, and the parties appearing and making virtual *confession* of the truth of the allegations and *disclaimer* of title to the offices, the court, by implied consent, made an order for the dissolution of the pretended corporation, and the ouster of the disclaiming officers.

The statute gives merely *jurisdiction* to this court of these prerogative writs, and prescribes no forms or rules for proceeding; but, by manifest implication, adopted the function and manner of use of the proceedings then uniformly practiced in the common-law courts of England. The analogy of practice in *certiorari* is urged upon us. The analogy is not obvious. The inquiry in the application for *certiorari,* is based on the record, and is a substitute in sessions matters, for the writ of error, which applies only to common-law procedure. The court examine copies of the record upon which it is claimed that an erroneous judgment has been rendered in the inferior court, and if the court find error, they will order the record to be certified into this court, and render thereon such judgment as should have been rendered. The record imports verity, which neither party can dispute.

II. This proceeding is criminal in its form, but civil in its nature; and is addressed to the *judicial discretion* of this court.

It may be allowed or denied, in consideration of rights and consequences, the condition of the property and its owners, and its relation to the public.

The case discloses that said corporation has, by the Court of Chancery, been made *receiver*, and holds in trust the Vermont Central and Vermont & Canada Railroads, and is operating, under leases, several other railways in this and other states. The trust duties thus imposed are active, and executive in their nature, involving important duties and responsibilities, both to the *cestui que trust* and the public, and incurring, necessarily, from day to day, large liabilities in intricate and often complicated transactions in the administration of the trust, which, from the nature of the case, must be largely outstanding and unsettled. One of the incidents of a receivership is a bond, commensurate with the magnitude of the trust, approved by the Court of Chancery, and to respond to that court for the property, its income, and for all laches of administration. Such bond is presumed to have been furnished by those who have assumed the duties and have been the active administrators of the trust. If the present incumbents should be ousted, they would have the right to require that their personal liability by bond or otherwise, should cease with the ouster; and the chancellor would, doubtless, require new bonds, to respond any laches of administration. How far personal character, capacity, and responsibility, induced the appointment of this corporation receiver of this large property and executive trust, is known only to the chancellor. The Court of Chancery has absolute control of the trust and its administrators, and may so temper any order, as to restrain wrong and insure justice. While this court has no power upon this application, but to grant or refuse the petition, without discrimination as to the fitness or unfitness of *men* for the administration of so important a trust, it is easy to foresee that it is possible for complicated questions to arise between the outgoing and incoming directors as to liability and responsibility, and for a litigation to spring up, subjecting the trust to new burdens, without benefit to the parties or the public. We have no warrant for saying that such mischief would, necessarily, follow; but to some extent it is possible, and perhaps

probable; and though not of controlling weight when there is satisfactory proof that the office has been usurped by force or fraud, yet they are proper matters for consideration in the exercise of that judicial discretion which the petitioners invoke.

III. The *right* of the respondents to hold and exercise the office of directors of this corporation, depends upon the legality of the 2350 votes cast by Langdon and Millis on the stock in question. If such votes were lawfully cast, the respondents were duly elected directors, otherwise not.

Waiving, for the present, all consideration of the alleged conspiracy on the part of the respondents to forestall by fraud the majority of the stockholders in the election of the 19th of May last, and assuming that the transaction had wholly occurred six months before, and without reference to an immediate election, we inquire whether Langdon and Millis stand as purchasers and owners of such stock in this corporation. Mr. Park and associates in New York had agreed with Governor Smith and associates in Vermont, that they would subscribe for 20,000 shares of stock in this corporation, in certain agreed proportions. Park, in executing his part of the contract, signed in the name of two friends in New York, for 1500 shares without authority, which they repudiated. Whereupon Park assumed such subscription as his own, and the stock was entered upon the books of the corporation as belonging to Park. It is urged that this stock having first been subscribed in the name of Meyer and McKinney, was their stock, and Park, showing no written assignment, had no title or property in it. But Meyer and McKinney repudiated the subscription for the reason that Park was without authority to bind them by such contract. Park having subscribed for stock by an assumed agency not founded in fact, failing to bind the principal, bound himself. The five per cent. paid by Park was then placed to his credit by the corporation, and the subscription placed on the books as a subscription by Park in his own right. Park was then not only the equitable owner, but the original subscriber for the stock. The corporation had been made receiver of this large property, upon the representation that 20,000 shares of stock had

JANUARY TERM, 1876.                285

State ex rel. Page *v*. Smith et als.

been, *bona fide*, subscribed.   Park claimed that the corporation ought to relieve him from holding and carrying the stock subscribed in the name of Meyer and McKinney, and certain other parties made similar claims.   For certain reasons (and we have no right to assume that such reasons were inadequate or improper) the corporation purchased 2350 shares of such stock, and placed it on the books as stock belonging to the corporation like other assets.   It is claimed that thereby said stock became *merged* and extinguished.   The intent of the parties, and especially of the corporation, is important in determining the character of such transaction.   The corporation had no right to diminish its capital stock, and especially so under the circumstances of its receivership ; and the evidence concurs, that the corporation *purposed*, under advice of counsel, to hold the stock thus purchased as not merged, but subsisting as assets on the books of the company.   We think the legal effect of such transfer of the stock is fairly and correctly stated by the court in *Williams* v. *Savage Mfg. Co.* 3 Md. Ch. Decis. 451, to which we have been referred by counsel for the petitioners ; and in the case of *Bank of Columbus* v. *Bruce et al.* 17 N. Y. 507, referred to by the respondents. In the latter case, SELDEN, J., says : " It might or might not have that effect [extinguish the stock], at the option of the company. I think some manifestation of such intent should be proved, to produce that result."   And again he says : " I see nothing to prevent the re-issue and sale by the company of the stock so transferred ; and, in the absence of any proof to the contrary, the presumption is that the directors intended to act within the scope of their powers by selling the stock on hand instead of issuing new stock which they had no power to create."   In the former case, the chancellor says, after reviewing the cases on the subject, " But it does not follow that though the shares transferred to the corporation are merged for the time being, that they may not be subsequently revived ;   *   *   *   and whatever may be the temporary legal effect of the transfer, it has always been supposed, and the practice has always been with such general understanding, that they were authorized to revive the stock when they saw fit to do so."

The sale and transfer of stock, if done by proper authority, and was actual and not colorable, and not affected by any secret trust, if a *bona-fide* and absolute sale, vested in the purchasers the title to the stock with all the incidents of title, including the right to vote upon it.

V.  Was the property sold and transferred to the purchasers by such authority as should bind the corporation ?  We think the majority of directors who assembled on the directors car, and passed the resolution authorizing the sale of this stock to meet a liability becoming due on the first of June after, cannot lawfully be claimed as organized under the call of the clerk to meet at Bellows Falls at an earlier hour of the same day.  If we should hold that the call of the clerk by telegraph was in accordance with the by-laws, and the time sufficient, we think the attempted adjournment by a minority to a point fifty miles distant, was irregular, and did not transfer the place of legal *venue* under the call, to White River Junction.  But a quorum of the directors, regular in form, assembled on the car, and by resolution authorized the sale of this stock, and under that authority the stock was sold, and, as the proofs stand, for adequate and full consideration received by the company.

In *Bank of Middlebury* v. *R. & W. R. R. Co.* 30 Vt. 169, the court held that the action of a majority of the directors of a corporation, without any notice to the other directors, if within the scope of their authority, was legal, and bound the corporation. And the court say, that " if the authorized agents of a company have extended its business beyond the strict limits of their functions for which the charter was granted, the company would be bound by the extension, unless the corporators interfere to restrain such extension at the earliest moment "  See also *Stark Bank* v. *U. S. Pottery Co.* 34 Vt. 144.

The railroad law of our statute provides, p. 216, s. 3, " that the government and direction of the affairs of every such corporation, shall be vested in a board of not less than five * * * and a majority of the directors shall form a board, and shall be competent to transact the business of the company."  By the

express language of the statute, a majority of the directors are constituted a board, with full authority to do what all the directors, when assembled, could do in "the affairs of such corporation, and in the transaction of the business of the company." In *Edgerly* v. *Emerson*, 3 Foster, 555, in a very well-reasoned case, it was held that when a majority of bank directors are by the statute constituted "a board for the transaction of business," that "such board, when assembled, possess all the powers of the entire board of all the directors." The statute of New Hampshire declared that "no less than four directors shall constitute a board for the transaction of business." In that case, BELL, J., says: "There was before no difficulty, except as to the point of notice, and the only useful effect of the statute provisions relative to a quorum or the powers of a majority, is, to give them the authority to act in the absence of the others, and without notice to them. We are therefore of the opinion that when the quorum of a bank meet, and unite in any determination, the corporation are bound, whether the other directors are or are not notified." We think that the vote of the majority of the directors thus assembled was a lawful vote of the "board of directors competent to transact the business of the company." And if this transfer of the stock was not a transfer merely, but a sale beneficial to the company, and *bona fide*, it vested in the purchasers title to the stock; and though the "board" of directors which authorized the sale was under no regular call, and the two members of the finance committee who effected the sale may have been personally interested, and moved by partisan influence, yet, if the stock was the principal, available assets to meet an impending liability, and was sold for full value, the sale was, at most, voidable only, and could be impeached for cause only on the seasonable motion of the party claiming to be injured.

The case discloses that the relator was not only a large stockholder, and representing, as he claims, a majority of the stock, but was himself elected one of the directors on the 19th of May, and had been up to that time, vice president, and chairman of the finance committee. He was aware of the resolution of the directors, and the claim therein that the stock was sold and the

money paid to meet the installment due by contract in a few days for the purchase of the property of the Vermont & Canada R. R. Co. Whether it was necessary to sell this stock, is left, in the proof, to the parties to the sale, who aver that it was necessary, and that the sale was actual, *bona fide*, made for that purpose, without any secret trust or understanding that the purchase-money was to be returned, or that the purchasers had any other equivalent for their money than the stock thus purchased. So far as this case discloses, there is no question that the money paid for the stock went to the use of the corporation ; and all parties have acquiesced in the sale, unless this proceeding may be supposed to have brought it in question. The relator could, then, elect to challenge the validity of the sale, and take proceedings to avoid it, and demand that it should be annulled by a return of the consideration to the purchasers ; or he could acquiesce in the sale, and allow the consideration to go to the use of the corporation. But if a member of a corporation and associate director claims that the directors, as agents, have exceeded their functions in selling property in derogation of the rights of the corporation, that claim must be seasonably asserted in a manner that shall bind the parties to such sale : acquiescence would confirm the sale ; and allowing the consideration to be appropriated to the use of the corporation would adopt and ratify it.

It may be claimed that this proceeding to oust certain directors on the ground that they were elected fraudulently by votes upon this stock, is virtually a proceeding to avoid this sale. The purchasers are not made parties : Langdon's election is conceded ; Millis never was director, and claims to be a stockholder by virtue of the ownership of this stock. Whatever may be the order of the court in this case, it could have no effect upon the *rights* of Langdon and Millis Suppose a new election should be ordered, as under statute law is the practice in many of the states, and Millis, offering his votes on this stock, should be challenged. It could not be claimed upon any evidence or suggestion in this case, that if the purchase of this stock was voidable, it had not been fully confirmed by acquiesence and allowing the purchase money to go the use of the corporation.

VI. It is insisted that there was a pre-emption right in all the stockholders to purchase a proportionate share of this stock. We are referred to *Gray* v. *The Portland Bank*, 3 Mass. 364, and Angell Corp. ss. 554–5. The two sections in Angell seem entirely based upon the former case, and the text is but a quotation from the opinions of SEWALL and SEDGWICK, JJ., who gave the opinions of the court in the case. In that case, the plaintiff Gray was a large owner of stock in a banking corporation, under a charter that authorized the corporation to issue stock not less than $100,000 nor over $300,000. The corporators organized under the lesser capital, purchased a banking house, and had accumulated a surplus of profits. The stockholders then voted to enlarge their capital and issue the residue of the stock allowed by the charter and constituted the directors a committee to issue and distribute the residue of such stock to the existing stockholders. The plaintiff being a large owner of the stock first issued, and a proportionate owner of the surplus profits of the bank, which was an incident of his stock, tendered the money to said committee, and demanded his proportionate share of the new issue of stock, and was refused. He then sued the bank in assumpsit for his share of the dividends on such stock and for damages for such *refusal*, claiming it to be a breach of contract. The court held that the plaintiff could not recover *dividends* because the stock was not *owned* by the plaintiff; but a *good title* thereto was vested in the subscribers to whom the directors had distributed it. Second, the court held that the directors in issuing new stock to strangers, and thereby making them shareowners in the existing *surplus profits*, a fixed share of which then was owned by plaintiff, was a wrong to him, for which he might recover. When *new* stock is issued, that shares equally with the existing stock, the shareowners have a right that it shall be so distributed as not to divest any stockholder of his present vested right in property; and the proportionate share of the accumulated profits is represented by the shares, and is *vested property*, as much so as the shares themselves. We entirely accord with the reasoning of this case. And if the cases were analogous in their facts, by this authority Langdon and Millis became and are

37

the undisputed owners of the stock in question.   But this was not a *new issue* of stock, but a portion of the original subscription, and its identity has been preserved, as we have shown.   The transfer of the stock to the corporation suspends the right to vote upon it, and may be a merger if so understood by the parties.   The right of the directors to reissue or sell such stock for honest purposes, and for the benefit of the corporation, is reasonable, and amply sustained by authority.   See opinion of DAVIES, J., in *Hartridge et al.* v. *Rockwell et al.* R.M. Charlton (Ga.), 260.

VII. It is insisted that this stock was transferred for the purpose of giving the preponderance of votes to the respondents. We have no doubt that such motives were strong inducements at the time, and that the respondents were determined to resort to every lawful agency to maintain their position, and repel the movement of the relator.   We have no opinion of the merits of the controversy, or of the wisdom or propriety of the acts of the parties, as disclosed by the testimony.   There are some matters disclosed which, in the *forum of conscience*, would be obnoxious to criticism, that are not unlawful and are not properly brought in question in this proceeding.   The case shows that this stock was not merely *transferred*, but *sold*, and that the sale was *actual*, not *colorable;* and that there was no *secret trust* or condition ; that the sale was for a necessary purpose, and beneficial to the company ; that the full value was paid to the corporation, which has gone to its use.   We think such sale is not void, but like any other sale, can be impeached only for *cause;* and, that the controlling inducement for the purchase at the time, of this stock, was, to enable the purchaser and his friends to outvote the relator and *his* friends, does not vitiate the sale, if otherwise for honest purposes and for full value.   We think, also, that the consideration having gone to the use of the corporation without challenge or seasonable proceeding to rescind or avoid the sale, the sale has become ratified and adopted by acquiescence.   And we do not think that the reasons and principles that have guided this decision, are the novel and sinister outgrowth of some abnormal state of things in this state, as was remotely hinted in the

argument, and peculiar to Vermont, but are universal as juris-prudence, and fundamental as justice.

The rule to show cause is therefore discharged, and the petition dismissed.