Argued October 7, 1915.
Modified February 1, rehearing denied April 4, 1916.

## SARGENT v. AMERICAN BANK AND TRUST CO.

(154 Pac. 759, 156 Pac. 431.)

**Banks and Banking—Legal Capacity to Sue—Liability of Stock-holders—Conversion.**

1. Under Section 4586, L. O. L., as amended by Laws of 1911, page 244, providing that the superintendent of banks may liquidate the affairs and administer the assets of a bank of which he has taken charge, and do whatever is necessary to preserve its assets and business, and enforce the individual liability of stockholders, the superintendent of banks representing primarily the creditors and depositors of the bank had legal capacity to sue defendant for the value of stock transferred to him in consideration of a convey-ance of realty to which his title was practically worthless, and for the value of other stock alleged to have been wrongfully converted by him to his own use.

**Banks and Banking—Action by Superintendent of Banks—Defense—Fraududent and Unauthorized Acts of Bank.**

2. In a suit by the superintendent of banks against a stockholder of an insolvent bank for the value of stock converted by him to his own use, and also stock transferred to him in consideration of a worthless title to realty, fraudulent and unauthorized acts of the bank are not available as a defense.

**Banks and Banking—Stock—Purchase by Bank—Validity.**

3.   Under Section 4569, L. O. L., forbidding a bank to buy its own stock except under circumstances not existing when the stock in question was surrendered, an attempted surrender of bank stock by a subscriber who had given worthless assets of another bank in exchange therefor, was void, and did not vest the bank with ownership of the stock surrendered or give it a right to reissue same.

**Banks and Banking—Insolvency—Subscriber—Liability.**

4.   In a suit by the superintendent of banks to recover from a stockholder of an insolvent bank the value of stock for which he had given a practically worthless title to realty, the fact, if it were a fact, that the stock was some which had been unlawfully bought in by the bank and reissued to defendant, did not render him any the less a subscriber liable for whatever he had not paid on the stock.

**Banks and Banking—Insolvency—Action by Superintendent of Banks —Defense.**

5.   In a suit by the superintendent of banks for the value of stock for which defendant had given practically worthless property, it was no defense that defendant had caused part of the stock to be issued to a third person.

**Banks and Banking—Insolvency—Suit by Superintendent of Banks— Defense.**

6.   Where, in a suit by the superintendent of banks for the value of stock for which defendant had given a practically worthless title to realty, it appeared that the transaction was a fraud on the bank, its stockholders and creditors, and that for several months after it took place, defendant acted as president of the bank, and held it out to the public as being solvent, he could not be heard to say by way of defense that the bank stock was as worthless as his title to the realty.

**Banks and Banking—Sale of Bank Stock—Duty of Subscriber.**

7.   A subscriber to the stock of a bank must exercise the utmost good faith to see that what he gives in exchange is equal to the par value of the stock.

**Banks and Banking—Sale of Stock—Payment in Realty.**

8.   Under Section 4571, L. O. L., prohibiting banks from purchasing realty except such as is necessary for the location of its business, including other premises in the same building to rent for income not exceeding in cost 50 per cent of its paid-in capital, surplus and undivided profits, and such as shall be conveyed to it in satisfaction of debts previously contracted, or as shall be purchased by it for its protection at judicial sales, an attempted payment for bank stock in realty, not within the exceptions of the statute, was unauthorized and amounted to no payment at all, except to the extent that the proceeds of the attempted payment went to swell the bank's assets.

**Banks and Banking—Insolvency—Suit for Value of Stock—Defense.**

9.   In a suit in equity by the superintendent of banks for the value of bank stock bought by defendant, defendant could not be heard to say by way of defense that he had given certain property in ex-

change for the stock, where it appeared that after becoming president of the bank he removed such property from the bank's assets and converted it to his own use.

### Banks and Banking—Liability of Stockholders—Release—Validity.

10. Where a purchaser of bank stock gave in exchange therefor practically worthless property, a release, executed in the name of the bank and signed by its manager and cashier, of all claims against such purchaser, was ineffective, where it was executed without authority of the board of directors or of the stockholders.

### Banks and Banking—Insolvency—Suit by Superintendent of Banks—Defense.

11. An indemnity agreement purporting to be a sale of bank stock to another by defendant, who had purchased same giving practically worthless property therefor, was unavailable to protect defendant from liability for the value of stock in a suit by the superintendent of banks, where it appeared that the transaction was in fact a retransfer of the stock to the bank and a mere subterfuge to circumvent the law which prohibits a bank from purchasing its own stock, and was adopted to enable defendant to escape liability.

### Banks and Banking—Conversion of Bank Stock—Restoration—Right of Recovery.

12. Where in a suit, brought by the superintendent of banks in the interest of creditors and innocent stockholders of an insolvent bank for the unlawful appropriation of bank stock which defendant, while president of the bank, unlawfully and without consent of the directors caused to be issued to himsef and for which he paid nothing, it appeared that defendant had restored the equivalent of that which he had thus unlawfully retained, and that the bank had lost nothing by the transaction, plaintiff was not entitled to recover for such conversion.

### Banks and Banking—Insolvency—Superintendent of Banks—Jurisdiction in Equity.

13. That the books of an insolvent bank showed on their face a regular purchase and issue of bank stock to defendant and a payment credit of the reasonable value thereof in realty and stock of another company, when in fact such realty and stock were worthless and such credit fraudulent, and that defendant had obtained an apparently regular release of liability signed by the officers of the bank, when in fact the release was unauthorized and fraudulent, authorized the institution of a suit in equity by the superintendent of banks; it clearly appearing that a suit at law would not afford an adequate remedy in such case.

### Banks and Banking—Insolvency—Suit by Superintendent of Banks—Defense—Bond of Indemnity.

14. In a suit by the superintendent of banks against a stockholder of an insolvent bank to recover the value of stock issued to him in exchange for practically worthless property, a bond signed by another stockholder and the bank, indemnifying defendant against liability to stockholders of the bank, constituted no defense; the stockholder's undertaking being a personal matter between him and defendant, and the bank's undertaking being void as to its creditors.

**Banks and Banking—Insolvency—Suit by Superintendent of Banks—Parties.**

15. In such suit, it was not necessary to make all the stockholders of the bank parties; the superintendent of banks having authority to bring any suit that the bank or any stockholder could have brought.

**Banks and Banking—Insolvency—Suit of Superintendent of Banks—Defense.**

16. In a suit by the superintendent of banks for the value of stock exchanged for practically worthless property, it was no defense that other stockholders had failed to pay in full for their stock.

**Banks and Banking—Insolvency—Suit by Superintendent of Banks—Plea in Abatement—Pendency of Another Suit.**

17. In such suit, a plea in abatement alleging that plaintiff was suing another person for a subscription for the same stock was not available, though such fact might be considered as evidence of an admission by plaintiff that such other person and not defendant was the person liable.

**Interest—Accrual of Right—Nature of Liability.**

18. Where a purchaser of bank stock agreed to pay therefor in land and stock of a messenger company, on the rendition of judgment against him for the value of the bank stock on the ground that the land and messenger company stock were not as represented, the purchaser having strenuously controverted his liability in good faith, he is liable for interest only from the judgment, and not from the original contract of purchase.

**Interest—Nature of Right—Statutory Provision.**

19. In Section 6028, L. O. L., providing that the rate of interest shall be 6 per cent per annum "on all moneys after the same becomes due; on judgments and decrees for the payment of money," on money received to the use of another and retained beyond a reasonable time without the owner's consent or on money due on the settlement of matured accounts, and when there is a contract to pay interest and no rate specified, the semicolon divi ling the clause quoted should be disregarded, so that the first class on which the statute provides for interest is money due on judgments and decrees.

**Statutes—Construction—Intent of Legislature—Punctuation.**

20. Under Section 716, L. O. L., providing that in construing a statute the intention of the legislature must be pursued, if possible, punctuation marks may be referred to to aid in ascertaining the legislative intent, but, if necessary to discover the true meaning of a statute, courts will disregard the punctuation, or even repunctuate.

**Interest—Nature of Right—Statutory Provision.**

21. While interest may sometimes be allowed as damages, the right to interest eo nomine must, in the absence of agreement to pay interest, be found in the statute.

From Multnomah: Robert G. Morrow, Judge.

In Banc.    Statement by MR. JUSTICE McBRIDE.

This is a suit brought by S. G. Sargent, as superintendent of banks of the State of Oregon, on behalf of all the creditors of the American Bank & Trust Company against said bank and L. O. Ralston, in which it is sought to secure a decree against the defendant Ralston for the sum of $34,300, with legal interest alleged to be due the bank on account of certain transactions between him and the defendant bank. The complaint states two causes of action. The first of them may be summarized as follows:

"The defendant corporation has an authorized capital stock of $150,000, divided into 1,500 shares of the par value of $100 a share; that on or about the second day of May, 1908, the defendant L. O. Ralston subscribed for 245 shares of the capital stock of said corporation; that the said defendant L. O. Ralston in payment of the said 245 shares of said capital stock of said defendant corporation transferred by quitclaim deed to the said defendant corporation, the following described property [here follows description of the property]; that at the same time, and as a part of the same transaction the said defendant L. O. Ralston transferred to the said defendant corporation, as a part consideration for the said 245 shares of the capital stock of defendant corporation, 23 shares of the capital stock of the City Messenger & Delivery Company; that the said defendant L. O. Ralston represented to the officers and directors of the defendant corporation that the real property described in paragraph 5 hereof was of the reasonable value of $22,200; that he had a good merchantable title to said real property; that he would convey the said real property free of all encumbrance and by warranty deed to the said defendant corporation; that relying upon these representations, which the defendant L. O. Ralston well knew to be false at the time he made them, the said defendant corporation issued 245 shares of its capital stock to the said defendant Ralston, to its prejudice

and injury herein; that the said representations were false and fraudulent at the time he made them; that the only title said defendant Ralston had to the said real property, or any part thereof was, by virtue of deed from the sheriff of Multnomah County, Oregon, as tax collector; that the said real property was sold in January, 1905, to the said defendant L. O. Ralston for delinquent taxes of the year 1903; that since January, 1905, the defendant L. O. Ralston has acquired no further right, title or interest in or to said real property; that the total consideration paid by the defendant Ralston to the sheriff of Multnomah County for said real property was $99.64; that the title held by the said defendant Ralston to said real property was practically valueless, and known by the said defendant Ralston to be practically valueless; that the said defendant Ralston, though often requested by the officers and directors of the said defendant corporation, has failed, neglected and refused to convey the said real property described in paragraph 5 hereof, by a warranty deed to the said defendant corporation; that the said defendant Ralston has further failed, refused and neglected to pay any other or further consideration for the said 245 shares of the capital stock of the said defendant corporation issued to him as aforesaid; that on the second day of May, 1908, the said defendant L. O. Ralston was duly elected as president of the said defendant corporation, and continued as such president until on or about the tenth day of January, 1910; that during the time the said Ralston was president of said defendant corporation, he removed from the said defendant corporation without any action of the board of directors, or without any authority therefor, or without paying any consideration therefor, the said 23 shares of the capital stock of the said City Messenger & Delivery Company; that the said defendant corporation received no consideration for the purchase of the said 245 shares of its capital stock other than as hereinabove alleged, save and except the sum of $300 received for the sale of lot No. 5, in section No. 30, township No. 1, north of range 5 east, containing 11.35 acres, more or less, lying and being within

Multnomah County, State of Oregon, said above-described real estate being a portion of the real property conveyed by the said defendant Ralston to the said defendant corporation, and being the only portion of said real property so conveyed by the said defendant Ralston that the defendant corporation could dispose of for the reason that the title to the said property was of no value, as hereinbefore alleged; that the par value of the said 245 shares of the capital stock of the said defendant corporation so subscribed for by the said defendant L. O. Ralston, as alleged in paragraph 5 hereof, is $24,500, which sum the said defendant Ralston promised and agreed to pay therefor, and that no part thereof has been paid, except the sum of $300 received for said 11.35 acres lot described in paragraph 7, and that there is now due and owing from the said defendant L. O. Ralston to this plaintiff as state superintendent of banks of the State of Oregon on behalf of the creditors of the defendant corporation the sum of $24,200, with interest thereon from the second day of May, 1908, at the rate of 6 per cent per annum.''

The second cause may be stated as follows:

''That the said defendant corporation has an authorized capital stock of $150,000, divided into 1,500 shares of the par value of $100 a share; that on or about the eleventh day of May, 1908, the defendant L. O. Ralston caused to be issued to himself 91 shares of the capital stock of the said defendant corporation; that on or about the eighth day of December, 1908, the defendant Ralston caused to be issued to himself 10 shares of the capital stock of the said defendant corporation; that the defendant L. O. Ralston caused the said stock to be issued to himself without any authority of the board of directors of said defendant corporation, or without paying any consideration therefor; that the said defendant, though often requested, has failed, refused, and neglected to pay any consideration for the said 91 shares of the capital stock of the said defendant corporation or for the said 10 shares of the capital stock of said defendant corporation, and there remains due and owing the plaintiff on

behalf of the said defendant corporation from the defendant L. O. Ralston therefor the sum of $9,100 and interest thereon from the eleventh day of May, 1908, at the rate of 6 per cent per annum, and the further sum of $1,000 and interest thereon from the eighth day of December, 1908, at the rate of 6 per cent per annum.''

It is also alleged that a release of liability from the defendant bank to Ralston was executed without consideration and without authority of the board of directors, and was void.

The defendant demurred upon each of the statutory grounds specified in Section 68, L. O. L., and, the demurrer being overruled, answered, denying all the material allegations of the complaint, and pleaded a number of affirmative defenses, among which was a transfer by defendant Ralston of the 346 shares of stock of defendant bank to Samuel Connell, a release executed in the name of the bank and signed by its president and secretary of all claims against defendant Ralston, and a bond signed by Connell and the defendant bank indemnifying defendant Ralston against all liability to existing creditors of the bank as to any balance due on said shares of stock or any other claim or demand that might arise out of Ralston's ownership of said 346 shares, and containing a covenant that Connell should satisfy all such claims and save Ralston harmless therefrom. It was further alleged that such proceedings were taken with the knowledge and consent of the officers and stockholders of the bank, that Connell was still the owner of the 346 shares of stock, and that the plaintiff, the defendant corporation, and its officers and stockholders were therefore estopped to maintain this suit. By a further and separate answer it was averred that all persons who were creditors of the defendant bank at the date of the as-

signment of stock by Ralston to Connell had ceased to be creditors upon the commencement of this suit. It was also declared that Connell was a necessary party to this suit, and should be made a defendant therein. A further defense stated that plaintiff had no legal authority to sue, which defense was stricken out on motion of plaintiff. Thereafter a supplemental answer was filed by the defendant, alleging, in substance, that on or about the twenty-seventh day of August, 1913, the plaintiff in this suit commenced another and different suit, in the same court, against G. W. Waterbury, E. C. Knoernschild, C. W. Miller, S. Logan Hays, Julius H. Alexander, John E. Davis and W. A. Currie, defendants therein, to recover from them on their subscription to 2,500 shares of the capital stock of the Bank of America, setting forth the complaint in that suit, including the prayer, and making the following additional allegations, to wit:

"That any capital stock of the American Bank & Trust Company, which this defendant ever owned or held therein, was delivered to him from and out of the capital stock of the said defendants in the said suit commenced on or about the twenty-sixth day of August, 1913, and which is now pending before this court, and that such suit was commenced after the commencement of this suit, and after this defendant Ralston had filed his answer herein; that the plaintiff in the suit commenced, on or about the twenty-sixth day of August, 1913, and which is now pending before this court, and that such suit was commenced after the commencement of this suit, and after this defendant Ralston had filed his answer herein; that the plaintiff, in the suit commenced on or about the twenty-sixth day of August, 1913, seeks to recover from the defendants therein on account of their respective subscriptions of capital stock of said corporation, for and on account of the subscriptions to the identical capital stock, and the issue thereof, to such defendants, for

which the plaintiff seeks to recover against this defendant for and on account of his alleged subscription to such capital stock, and the alleged issuance of such capital stock to this defendant; that any and all of the capital stock of the American Bank & Trust Company, which was ever owned or held by, or was ever issued to this defendant, was the capital stock which a long time prior thereto had been subscribed for and was issued to the defendants in the other suit, by reason of which the plaintiff is not entitled to have or recover any decree against this defendant for any stock which was issued to, or ever owned or held by him, which prior thereto had been subscribed for and issued to the defendants, or either of them, in the other suit above mentioned."

A further statement of issues appears in the opinion. There was a decree for plaintiff and defendant appeals.

MODIFIED.

For appellant there was a brief with oral arguments by *Mr. Charles A. Johns* and *Mr. Jay Bowerman.*

For respondent there was a brief over the names of *Mr. Sidney Graham* and *Mr. Isaac H. Van Winkle,* Assistant Attorney General, and *Mr. Geo. M. Brown,* Attorney General, with oral arguments by *Mr. Graham* and *Mr. Van Winkle.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. At the threshold of the discussion of this very intricate case we are met with the suggestion that the superintendent of banks has not the legal capacity to maintain this suit. It must be premised that the authority of that officer is purely statutory, and unless it is given in express language or by necessary implication from the language used, he does not possess it.

Section 4586, L. O. L., as amended by the Laws of 1911, Chapter 171, provides, among other things, that the superintendent of banks may, under certain circumstances (shown to exist here), take possession of the property and business of a bank, and liquidate its affairs and administer upon its assets. It is further provided that he may collect money due the bank and do such other acts as are necessary to preserve its assets and business, and may, if necessary to pay the debts of such bank, enforce the individual liability of stockholders. The first cause of action is based upon the allegation that defendant Ralston subscribed for 245 shares of stock, and procured its transfer by promising to convey to the bank certain real estate, which he falsely represented was of the value of $22,500, whereas in truth he had only a practically worthless tax title to the property, from which the bank realized only $300; that the worthless character of his title was well known to him, and that such representations were made with intent to defraud the bank; that in 1910 Ralston caused to be executed a release from all liability to the bank, signed by the manager and cashier, but that said release was not authorized by the board of directors or by the stockholders, and was without consideration and void. Other allegations too numerous to be inserted here show the insolvency of the bank, the extent of its assets, liabilities and the necessity of enforcing the liability of stockholders. The superintendent of banks represents primarily the creditors and depositors of the bank. If he merely represented the corporate entity, there would be little reason for permitting him to interfere in the winding up of an insolvent institution. His duties and rights are, except as somewhat extended by the statute, analogous to those of a receiver of a national bank or a

trustee in bankruptcy under the federal statutes. The extent of the authority of a trustee in bankruptcy has been defined by this court in the case of *Falco* v. *Kaupisch Creamery Co.*, 42 Or. 422 (70 Pac. 286), in the following language:

"From this doctrine it necessarily follows that unpaid subscriptions to the capital stock of a corporation pass like other assets to the trustee in bankruptcy, and he is the only party that can bring an action or proceeding thereon: *Sanger* v. *Upton*, 91 U. S. 56 [23 L. Ed. 220]; *In re Crystal Springs Bottling Co.* (D. C.), 96 Fed. 945; *Lane* v. *Nickerson*, 99 Ill. 284. And it also follows that any fraudulent act of the corporation itself, intended to deprive the creditors of a right to resort to the unpaid subscription, is of the same nature as fraudulent conveyances of any other property of the bankrupt, and may be avoided at the suit of a trustee. * * "

The rights and duties of a receiver of a national bank are prescribed in the following opinions of the federal and state courts:

In *Case* v. *Terrell*, 11 Wall. 202 (20 L. Ed. 134), wherein it was contended that the receiver represented the government, the court answered said contention:

"As to the receiver, the claim, if any such be made, is not worth serious consideration. He represents the bank, its stockholders, its creditors, and does not in any sense represent the government."

In the case of *Brown* v. *Schleier*, 118 Fed. 986 (55 C. C. A. 475), the court says:

"As such receiver he is vested with all the rights of creditors and the rights of the corporation itself, and may doubtless challenge any wrongful act which creditors could challenge, and maintain such suits against third parties, including actions against directors and stockholders of the bank on account of wrongful and fraudulent acts, as the corporation might maintain."

2. Nor is a receiver, and by parity of reasoning the commissioner of banks in the instant case, bound by the fraudulent or unauthorized acts of the bank. The reasons for this are clearly stated in *Hayes* v. *Kenyon*, 7 R. I. 141, wherein the court says:

"The first objection urged to the verdict is, that the court misdirected the jury when instructing them that the plaintiff represented the creditors of the bank, and could look behind its acts in the assertion of their rights. It is difficult, however, to see the force of this objection in a case where the charge and the proof is, that the defendant, in a breach of his trust, as president of the bank, connived with sharpers to sell out the bank to them, and take payment from them in the assets of the bank, knowing, or having every reason to know, that their purpose in the purchase was to defraud the public. One would think, especially if this was done without authority even formally legal, that it was a wrong for which the bank itself might have redress, if it was ever rescued from the hands into which it had fallen so as to be able to seek it, and that the plaintiff might maintain this action as representing the corporation only. Considering, however, the purpose of the bank act, we deem this a very narrow and false view of the scope of the receivership provided by it. The proceeding under which the receiver is appointed, is not a proceeding by the corporation, but against it. It is not for the corporation, but exclusively for the public, as billholders, and for those having funds in its hands as depositors; and it is only when they are in danger of being defrauded, or the bank has become insolvent, that commissioners or the court can act: Rev. Stats., c. 126, § 47. The duty of the receiver, as marked out by the statute, regards the creditors, and not the corporation, which is to be wound up. The forty-ninth section provides for the payment of the debts of the corporation out of its assets, giving a preference to billholders; and it is only after the creditors are satisfied and the expenses of the trust paid that the stockholders are to receive anything. It is true, that by the fiftieth section, the

receiver is clothed with all the powers and rights of the corporation in respect to the collection of debts, conferred upon it by charter or otherwise; but this, so far from being designed to limit his powers, was designed to clothe him with special powers and authorities. His principal office, under the law, as we have seen, is to care for and represent the interest of creditors; and in all such cases, the receiver or assignee, call him by whatever name you will, may take advantage of any fraud in derogation of the rights of creditors, to which the insolvent debtor was a party. A deed which is void as against creditors is void also as against those who, by law, represent creditors: *Doe d. Grimsby* v. *Ball*, 11 Mees. & W. 531, 533. If this principle were not applied to the receivers of insolvent banks, the receivership would, in a great number of cases, be of very little use.''

3–5. We will now consider the facts relating to defendant Ralston's relations with the company in order to determine whether he is to be treated as a subscriber for stock held by the company or a purchaser of stock previously subscribed and paid for and repurchased by it. It appears from the testimony that previous to Ralston's dealings with the bank one G. W. Waterbury and others had subscribed for 850 shares of stock in the corporation, and had pretended to pay for it in assets of the Bank of America, representing them to be of the value of $85,000, although they were in fact probably worthless. Waterbury subsequently attempted to surrender his shares, which were taken up by the bank and canceled. This proceeding was wholly outside of the law and in defiance of Section 4569, L. O. L., which forbids a bank to become the purchaser of its own stock, except under circumstances which are not shown to have existed at the time the stock in question was surrendered. It follows that the transaction was void, and the bank never legally became the owner of the Waterbury stock, and therefore had no legal

right to reissue it. When Ralston contracted to purchase stock, he did not apply for the Waterbury stock or any particular stock. He merely contracted to purchase 245 shares of stock, and to pay therefor by conveying to the company real property worth $22,200, and 23 shares of city messenger stock to cover the balance of the purchase price. The memoranda upon stubs of the stock certificate book show that the shares issued upon the consideration of Ralston's conveyance and the deposit of messenger stock were a reissue from the shares surrendered by Waterbury and his associates; but such memoranda are evidently made at a later date than the issue of the stock, contain interlineations and erasures, are written with different ink from that used on other parts of the stub; and, considering the fact that Ralston, a short time subsequently, became president of the bank, he either made the memoranda himself or caused them to be made by the then superserviceable MacGibbon with the intent to escape liability as a subscriber. Even granting that it was surrendered to the bank by Waterbury because not paid for, because the consideration failed, or for any reason, and that after it had been so surrendered, the bank in form reissued it to Ralston, this fact would not render him any the less a subscriber. The bank had no right to purchase its own stock. If it did so, it diminished its capital by just so much as the shares purchased represented, unless the stock so surrendered or purchased is to be treated, as in equity it should, as having gone back into the general mass of original stock and thereby become subject to subscription. This view is sustained by the following authorities: *State ex rel.* v. *Smith et al.,* 48 Vt. 266; *Pabst* v. *Goodrich,* 133 Wis. 43 (113 N. W. 398, 14 Ann. Cas. 824); *Porter* v. *Plymouth Gold Min. Co.,* 29 Mont. 347 (74

Pac. 938, 101 Am. St. Rep. 569); *Bank* v. *Wickersham,* 99 Cal. 655 (34 Pac. 444); *Wells & Co.* v. *Thompson Mfg. Co. and Foley,* 54 Mo. App. 41; *Commonwealth* v. *Boston & Albany R. Co.,* 142 Mass. 146, 155 (7 N. E. 716); *Belknap, Receiver* v. *Adams and Rice,* 49 La. Ann. 1350 (22 South. 382). So that while the testimony indicates that there was original stock on hand to satisfy the exigency of Ralston's purchase, yet upon his own theory he is still liable as a subscriber for any amount he has failed to pay. Some question is raised on account of the fact that the certificates for 35 of the shares included in the transaction were issued in the name of L. R. Ralston and 10 shares in the name of J. M. Long, but the fact remains that they were issued upon the faith of defendant's agreement to pay for them by conveying the real estate and transferring the messenger stock, and he cannot escape liability by causing them to be issued upon the books of the company to other persons. We are of the opinion that defendant Ralston must be treated as a subscriber for the 245 shares embraced in the transaction above detailed: *McAllister* v. *American Hospital Assn.,* 62 Or. 530 (125 Pac. 286); *Jackson* v. *Traer et al.,* 64 Iowa, 469, 480 (20 N. W. 764, 52 Am. Rep. 449). This conclusion being reached, we will next consider the evidence as to payment.

6. It may be premised that the law and public policy alike demand that a stock subscription shall be paid for in money or something just as good as money. The evidence indicates that Ralston offered to deed to the bank property of the value of $22,200. There is slight evidence as to its value, but the fact was that he had no title to the property beyond that obtained by a tax certificate or deed; such titles in this state being notoriously worthless as a basis of title, and for

which he had paid $90. After getting the stock transferred, he tendered a quitclaim deed, which even MacGibbon, the then president, refused to accept or record, demanding a warranty deed, but which subsequently, probably after Ralston's election to the office of president, found its way into the record, and the bank was afterward dispossessed of the property, but in some way did manage to get $300 out of it. The whole transaction was a swindle upon the bank, its stockholders, and creditors, worthy of the cheapest bunco steerer. It does not lie in the mouth of Ralston to say that the title was as valuable as the bank stock. For many months afterward he acted as president of the bank, received deposits, disposed of stock, and in every way held it out to the public as a solvent and reputable bank, when, if its stock was as worthless as the title he attempted to palm off on the bank, he knew that the concern was rotten. If it was, it was he and MacGibbon and Waterbury and their ilk who made it so, and justice will be subserved by holding them to their subscriptions until every creditor is satisfied. Defendant should pay this $22,200 in full, less the $300 realized out of the property.

7–9. The discussion as to whether a contract, to "make a deed" is fulfilled by giving a quitclaim deed is beside the question which is involved in the instant case. We are not prepared to dispute the contention of learned counsel that ordinarily such a contract is fulfilled by giving a quitclaim deed, but in the purchase of stock from a bank another consideration is involved. Its capital stock is its life blood. It is that upon which depositors rely in making their deposits. It is a sacred fund which the law requires to be kept intact; hence, the rule announced that capital stock must be paid for by the subscriber in money or in

something worth the money, and he who subscribes for stock from a bank must exercise the utmost good faith to see to it that what he gives i ι exchange is equal to the par value of the stock translated into terms of dollars and cents. Another proposition which is conclusive of this branch of the subject is that the bank had no authority to accept this real estate either in payment for stock or for any reason which appears in this case. Section 4571, L. O. L., provides:

"Any person, firm, or corporation doing a banking business in this state may purchase, hold, and convey real estate for the following purposes and no others: 1. Such real estate as shall be necessary in which to transact the business of any such bank, including with its banking offices, other premises in the same building to rent as a source of income, but which shall not exceed in cost to such bank 50 per cent of its paid in capital, surplus and undivided profits. 2. Such real estate as shall be purchased by or conveyed to such bank in satisfaction of, or on account of debts previously contracted in the course of its business. 3. Such real estate as it shall purchase at sale under judgments, decrees, or mortgage foreclosure under securities held by it. * * *"

In view of this section it is plain that an attempted payment in realty by Ralston for the stock purchased by him amounted to no payment at all, except to the extent that the proceeds of such attempted payment went to swell the assets of the bank. The alleged part payment in messenger stock was no payment at all. It is not shown to have been paid-up stock, or to have had any real value at the time it was turned over, and Ralston, after he became president, took it away, saying that he would either have to do that or pay for it, which indicates that it was either unpaid stock or that he was not the owner of it. In a court of equity a party will not be heard to say that he

80 Or.—3

paid a consideration for property and afterward stole the consideration, even if it actually possessed some value. Ralston was upon the witness-stand and gave no explanation whatever of this transaction. We find that the shares of messenger stock were then of no value, and that there was a failure of consideration to the extent that they were accepted as a payment.

10, 11. The attempted release of defendant from liability executed by the manager and cashier of the bank was without authority of the board of directors or of the stockholders, and is void. While the indemnity agreement purports to be a sale of the shares to Samuel Connell, the evidence shows that it was in fact a retransfer of the shares to the bank, and the assignment to Connell was a subterfuge used to circumvent the law, which prohibits a bank from purchasing its own shares. It was a device used for the purpose of enabling defendant to escape payment of his subscription, and is void as against creditors and innocent stockholders of the insolvent institution who are here represented by the bank examiner. The effect of the transaction upon the matters included in the second cause of action will be hereafter discussed.

12. Passing now to the second cause of action, it will be noticed that it is not brought to recover upon a subscription to capital stock, but substantially in damages for the unlawful conversion of shares of stock. It is alleged, in substance, that defendant, as president, unlawfully and without the consent of the board of directors caused to be issued to himself 101 shares of stock, and has refused to pay for the same, and judgment is asked for $10,100, the par value of the shares so unlawfully appropriated. The facts appear to be that for some reason, probably to enable the bank to

sell the shares at less than par value or to cover up the fact that it was holding or purchasing its own stock in violation of law, a block of stock consisting of 182 shares of the par value of $18,200, and being part of the stock surrendered by Waterbury and his associates, was held in the name of Ralston and MacGibbon as trustees for the bank; Ralston holding one half the shares, and MacGibbon the other half. With what seems to be a characteristic disposition to appropriate anything lying around loose, Ralston caused the 91 shares held by him as trustee to be issued to himself personally, and appears to have disposed of part of them for his own benefit or to have kept them. He paid the bank nothing for them, and when he was finally requested to withdraw he brought in what he had disposed of, and turned over to Connell apparently as an individual, but in fact as trustee for the bank, these shares, together with the 245 shares he had subscribed for in the first instance. Another certificate for 10 shares was issued to Mr. Ralston to enable him to borrow $1,000 for the bank. The money was borrowed and afterward repaid, and upon the final closing up of Ralston's business with the bank this stock was turned over to Connell. At the same time that the stock was turned over Ralston was permitted to take out certain notes due the bank of the face value of $8,500, and was paid $1,500 in cash. Connell gave his personal note for $10,000 to cover this, and afterward paid the note. Now, as Ralston is not sued as a subscriber for this 101 shares of stock, but merely for the conversion of it, and it appears that it was returned and accepted by the officers of the bank, and that the bank has lost nothing by the transaction, receiving, in fact, $8,500 of Connell's money in exchange for notes of doubtful value, it would seem inequitable

to compel Ralston to pay for the stock for which he is not sued as a subscriber and which he has returned.

13. The contention that plaintiff's remedy is by an action at law is untenable. The fact that the books of the bank showed upon their face a regular purchase and issue of stock and a payment credit of $22,200 in real estate transferred and of $2,300 in stock of the messenger company, when in fact such real estate and stock were worthless and such a credit a fraud upon the bank, its creditors, and stockholders, and the further fact that the defendant Ralston had obtained a release from all liability signed by the officers of the bank and apparently regular, when in truth the release was unauthorized, illegal, and therefore fraudulent, rendered the interposition of a court of equity imperatively necessary in order that these and other fraudulent devices of Ralston and his associates should be uncovered. To have submitted the mass of evidence and exhibits which have consumed a week of our time in their examination to a jury whose time for deliberation is necessarily limited would have been a farce.

14–17. The plea in abatement was not well taken. The undertaking by Connell to hold defendant harmless in any proceeding which might thereafter be had against him on account of his transactions with the bank is a personal matter between defendant and Connell. So far as the bank undertook to be surety on such undertaking, the transaction is wholly void and unauthorized as to creditors of the bank, as already intimated. As to its effect between defendant and Connell, it is unnecessary to express an opinion. Neither was it necessary to make all stockholders of the bank parties. The superintendent of banks, in our opinion, has authority to bring any suit that the

bank or any creditor or stockholder could have brought. The bank itself, if it could have been freed from the corrupt or incompetent officials who mismanaged its affairs, could have repudiated their unauthorized acts and compelled him to pay for the stock, and previous to the superintendent's taking possession any stockholder in the event of the refusal of the officers of the bank to act, could have brought such suit. The stock in contemplation of law was purchased upon an agreement to pay for it immediately in property equivalent to it in par value. The shares were delivered, but the defendant fraudulently failed to convey such property, and tendered a conveyance, which was practically worthless as an asset. Thereupon a cause of suit arose to compel him to pay in money this demand, which was an asset of the bank that its officials, one of whom was the defendant, fraudulently failed to enforce. The bank now having fallen into honest hands, a suit is brought to uncover the unauthorized acts by which defendant's fraud was concealed, and to compel him to do equity in the premises by paying the money for the stock for which he has subscribed. His contract to pay for stock is individual, and not dependent upon whether or not other persons have failed to pay in full for stock. Nor is the plea that the plaintiff is suing another party for a subscription for the same stock available here. If such a fact were shown, it might be considered as evidence in the nature of an admission by plaintiff that such other party, and not the defendant, was the person liable; but, as heretofore intimated, we are of the opinion that the evidence tends to show that plaintiff bought original unissued stock, and that the stubs in the stock certificate record have been fraudulently "doctored" in the interest of the defendant.

The history of this bank from the beginning is a record of deception, fraud and mismanagement. Publishing to the world by its articles that it had a capital stock of $150,000, an examination of the testimony shows that such capital was represented by $85,000 of the assets of an insolvent "tin-cup" bank of small value, something which is termed "Mt. Hood" stock, presumably a paper railroad and of less value, a little office furniture, a few other "chips and whetstones" of like character, and a very few thousand dollars in real money beguiled from the pockets of men like Leiter and Connell, who were deceived into believing that they were investing in a real bank and are now awake to the actual facts, poorer in pocket, but immensely richer in experience.

The decree of the court below will be modified so that plaintiff receive of defendant Ralston the sum of $24,200, with interest at 6 per cent per annum from May 2, 1908, and the costs and disbursements of this court and of the Circuit Court.

MODIFIED.    REHEARING DENIED.

MR. JUSTICE EAKIN took no part in the consideration of this case.

---

Denied April 4, 1916.

ON PETITION FOR REHEARING.

(156 Pac. 431.)

In Banc.    MR. JUSTICE HARRIS delivered the opinion of the court.

Both the appellant and the respondent have filed petitions for a rehearing; but a re-examination of the

questions involved in the appeal, except as to the allowance of interest, brings us to the same conclusions previously announced in an opinion (*Sargent* v. *American Bank & Trust Co., ante,* p. 16 (154 Pac. 759), which was the result of much thought and long deliberation. On July 10, 1915, the trial court granted a judgment on the first cause of action for $24,200, and allowed interest on that amount from May 2, 1908; and we affirmed the finding. The right to allow interest from May 2, 1908, is for the first time questioned by the appellant in his petition for a rehearing.

18. The judgment was predicated on the theory that the agreement of Ralston to purchase 245 shares of the capital stock of the bank and his attempt to pay for it with land and 23 shares of City Messenger & Delivery Company stock made him liable in money for the full value of the bank stock less $300. Ralston did not actually agree to pay in money. He agreed to pay in land and certain corporate stock; but, when it was ascertained that the stipulated consideration for the bank stock did not measure up to the representations made by Ralston, the law by its own compelling force substituted for the actual agreement to pay land and corporate stock an implied agreement to pay money. It was held in *Poppleton* v. *Jones,* 42 Or. 24 (69 Pac. 919), that a failure to keep an agreement to deliver building material as payment for an interest in land did not authorize the allowance of interest; and, applying the doctrine announced there, Ralston is not liable for interest from May 2, 1908. There is still another precedent which forbids the allowance of interest. Ralston has strenuously controverted any liability and has brought himself within *Baker County* v. *Huntington,* 48 Or. 593, 603 (87 Pac. 1036, 89 Pac. 144), where it was ruled that:

"When the right to recover in an action is in good faith denied, interest will not be allowed on the demand prior to its liquidation by judgment."

19. There is, however, a deeper and more pervading reason for denying interest before judgment. The facts presented by the record do not come within Section 6028, L. O. L., when that statute is correctly construed and interpreted in the light of its history. The plain design of the lawmakers was to allow interest only in specified cases; but the observance of a semicolon inserted after the words "on all moneys after the same becomes due" has had the effect of rendering the statute so far-reaching as to include practically all forms of indebtedness. Before attempting to analyze Section 6028, we shall first reproduce the statute as it was originally enacted, then give it as it was first codified, and finally set it forth as it now reads in our last Code, Lord's Oregon Laws, issued in 1910. The statute had its origin in 1862, and we here set down an exact exemplification of the original draft, preserving the spelling, language and punctuation, as it was passed by the legislature and filed in the office of the Secretary of State in 1862:

"That the rate of interest in this state shall be ten per cent. per annum, and no more, on all monies after the same becomes due, on judgments and decrees, for the payment of money, on money received to the use of another, and retained beyond a reasonable time, without the owners consent, expressed, or, implied; or on money due upon the settlement of matured accounts, from the day the ballance is ascertained; on money due, or to become due, where there is a contract to pay interest, and no rate specified. But on contracts, interest, at the rate of one per cent. per month may be charged, by express agreement of the parties, and no more": Laws, 1862, p. 115, § 1.

The statute was codified for the first time when it appeared on page 755 of Deady's Compilation, which was issued in 1866, and there reads thus:

"That the rate of interest in this state shall be ten per centum per annum, and no more, on all moneys, after the same becomes due on judgment and decrees, for the payment of money; on money received to the use of another, and retained beyond a reasonable time, without the owners consent, expressed or implied, or on money due upon the settlement of matured accounts, from the day the balance is ascertained; on money due or to become due, where there is a contract to pay interest, and no rate specified. But on contracts, interest at the rate of one per centum per month, may be charged, by express agreement of the parties, and no more."

The statute is found in Lord's Oregon Laws thus:

"The rate of interest in this state shall be six per centum per annum, and no more, on all moneys after the same becomes due; on judgments and decrees for the payment of money; on money received to the use of another and retained beyond a reasonable time without the owner's consent, expressed or implied, or on money due upon the settlement of matured accounts from the day the balance is ascertained; on money due or to become due where there is a contract to pay interest and no rate specified; but on contracts, interest up to the rate of ten per centum per annum may be charged by express agreement of the parties, and no more."

The printed volume of the Session Laws of 1862, with three minor exceptions, exactly reproduces the manuscript of the original. The Deady and Lane Code was published in 1874, and on page 623 we find the statute exactly as it was printed in Deady's Code of 1866. The semicolon which has caused so much confusion first made its appearance in 1880, when the statute was amended so as to change the rate of in-

terest; and in the original manuscript, as well as in the printed Session Laws of 1880, at page 17, a semicolon is found in the amended statute after the words "on all moneys after the same becomes due," and this semicolon appears in every subsequent printed compilation, including Hill's Code of 1887, Section 3587; Hill's Code of 1892, Section 3587; the amendment of 1898 changing the rate of interest, Laws of 1898, page 16; Bellinger and Cotton's Codes, published in 1902, Section 4595; and Lord's Oregon Laws, Section 6028. If the statute is construed as it is punctuated in Section 6028, L. O. L., it would result in allowing interest: (1) On all moneys after the same becomes due; (2) on judgments and decrees for the payment of money; (3) on money (a) received to the use of another and retained beyond a reasonable time without the owner's consent, expressed or implied, or (b) on money due upon the settlement of matured accounts from the day the balance is ascertained; (4) on money due or to become due where there is a contract to pay interest and no rate specified. If, however, we adopt a construction in accordance with the punctuation found in Deady's Code, then the statute would mean that the rate of interest in this state shall be 6 per centum per annum: (1) On all moneys after the same becomes due on judgments and decrees for the payment of money; (2) on money (a) received to the use of another, and retained beyond a reasonable time, without the owner's consent, expressed or implied, or (b) on money due upon the settlement of matured accounts from the day the balance is ascertained; (3) on money due or to become due where there is a contract to pay interest, and no rate specified.

20. The intention of the legislature must be ascertained, and that intention must be pursued, if possible

(Section 716, L. O. L.), and, while punctuation marks can never control the plain meaning of a statute, still they may ofttimes be of aid in ascertaining the legislative intent (36 Cyc. 1117); but, on the other hand, if necessary for the purpose of discovering the true meaning of a statute, courts will disregard the punctuation, or even repunctuate (*Baker* v. *Payne,* 22 Or. 335, 341 (29 Pac. 787); *State ex rel.* v. *Banfield,* 43 Or. 287, 291 (72 Pac. 1093). There is much evidence supporting the classification we have made based on the statute as punctuated in Deady's Compilation. It is sustained by the punctuation marks found in the writing which was actually adopted and filed as the enacted law. Every printed compilation of our laws passing through the hands of Judge MATTHEW P. DEADY is evidence that he did not construe the statute to mean interest "on all moneys after the same becomes due," but that he was of the opinion that the legislature intended to allow interest "on all moneys after the same becomes due on judgments and decrees for the payment of money." His opinion of itself would be entitled to much weight because of the large place which he filled in the constitutional, legislative and judicial history of this state. He was president of the constitutional convention; he was one of the three Code commissioners who wrote the Code of Civil Procedure that was adopted in 1862 by the same legislative assembly which passed the statute now under discussion; he compiled the first Code and collaborated with Lafayette Lane in the preparation of the second compilation of the General Laws of Oregon; and for many years he was United States District Judge for the District of Oregon.

The language employed in the statute confirms Judge DEADY's construction. The introductory words

to each class of cases are "on all moneys" or "on money," and this affords some, though slight, evidence of the true meaning of the whole. However, we do find convincing evidence in the words employed. It must be conceded that the legislature used all the words for some purpose. If the semicolon in question is ignored and what we term Judge DEADY's construction is adopted, then every word serves some purpose, and no word becomes useless. If interest is to be allowed "on all moneys after the same becomes due," it is a prodigal waste of words to say that the rate of interest shall be 6 per centum "on judgments and decrees for the payment of money," and it is absurd to add that interest is allowed "on moneys due * * where there is a contract to pay interest and no rate specified." If "on moneys after the same becomes due" constitutes the first class, then nearly all the words that follow are useless, because the first class would include practically all the others. If, however, the words "on all moneys after the same becomes due on judgments and decrees for the payment of money" define the first class of cases upon which interest is allowed, then every word and phrase in the statute performs its full part without needless repetition.

And, finally, the weight of precedent must be added to the reasons given for ignoring the troublesome semicolon and holding that the words "on all moneys after the same becomes due on judgments and decrees for the payment of money" constitute a single class, and that it is not enough that money be due, but it must be money due on a judgment or decree, or money due because received to the use of another and unreasonably retained, or money due upon the settlement of matured accounts, or money due or to become due on a contract to pay interest and no rate is specified. In *Richardson* v. *Investment Co.,* 66 Or. 353, 358 (133

Pac. 773, 775), this court, speaking through Mr. Justice BURNETT, said:

"If the legislature had intended to allow interest on all manner of monetary demands, it would have stopped short, in the section quoted, with the declaration that 'the rate of interest in this state shall be 6 per centum per annum, and no more, on all moneys after the same become due.' The specifications in the subsequent clauses of the section operate to exclude all other instances, else their mention were useless."

See, also, the significant language of Judge DEADY in *Dowell* v. *Griswold,* 5 Sawy. 23, Fed. Cas. No. 4040, where, after quoting all that part of the statute which ends with the words, "owners consent, expressed or implied," he speaks of "the latter provision of this section."

We therefore hold that the semicolon should be ignored, and the statute construed as though it read:

"On all moneys, after the same becomes due, on judgments and decrees for the payment of money."

Numerous adjudications have assumed that interest would run on "moneys after the same becomes due," as in *Hammer* v. *Campbell Gas Burner Co.,* 74 Or. 126 (144 Pac. 396); *Hawkins* v. *Investment Co.,* 38 Or. 544, 554 (64 Pac. 320); *Poppleton* v. *Jones,* 42 Or. 24, 31 (69 Pac. 919); *Baker* v. *Williams Banking Co.,* 42 Or. 213, 222 (70 Pac. 711); *Savage* v. *Salem Mills Co.,* 48 Or. 1, 25 (85 Pac. 69, 10 Ann. Cas. 1065); *Baker County* v. *Huntington,* 48 Or. 593, 603 (87 Pac. 1036, 89 Pac. 144). But an examination of those cases will show that in every instance the opinion was based upon an uncontroverted assumption.

21. It is true that interest may sometimes be allowed as damages: *Hawley* v. *Dawson,* 16 Or. 344, 349 (18 Pac. 592); *Durham* v. *Commercial Nat. Bank,* 45 Or. 385, 389 (77 Pac. 902); *Eldridge* v. *Hoefer,* 45 Or.

239, 244 (77 Pac. 874); *Seton* v. *Hoyt,* 34 Or. 266, 272 (55 Pac. 967), 75 Am. St. Rep. 641, 43 L. R. A. 634; *State* v. *Multnomah County,* 13 Or. 287, 297 (10 Pac. 635); 22 Cyc., p. 1476, and note at page 1496. The right to recover interest *eo nomine* must, however, in the absence of an agreement to pay interest, be found in the statute which confers it, and unless it is included, it must be deemed to be excluded: *Sorenson* v. *Oregon Power Co.,* 47 Or. 24, 34 (82 Pac. 10); *Graham* v. *Merchant,* 43 Or. 294, 311 (72 Pac. 1088); *Popple-ton* v. *Jones,* 42 Or. 24, 33 (69 Pac. 919); *Sammis* v. *Clark,* 13 Ill. 544, 546; *Hawley* v. *Barker,* 5 Colo. 118, 119; *Watkins* v. *Wassell,* 20 Ark. 410, 420; 22 Cyc. 1481. The instant case does not come within any of the classes provided for by Section 6028, L. O. L., when that section is properly construed.

The amount due from Ralston on the first cause of action was ascertained by a judgment of the trial court on July 10, 1915, and afterward affirmed by this court without changing the amount of the principal sum, as was done in *Kitchin* v. *Oregon Nursery Co.,* 65 Or. 20, 29 (130 Pac. 408, 1133, 132 Pac. 956), and consequently interest on $24,200 commences on the date of that judgment, and not on May 2, 1908, when the agreement to purchase the bank stock was made. With the exception of the modification concerning interest, we adhere to our former opinion, and deny the petitions for rehearing.

MODIFIED.    REHEARING DENIED.

MR. JUSTICE EAKIN absent.