Argued February 23, modified May 16, rehearing denied June 27, 1922.

## GRADY ET AL. v. DAY.

(206 Pac. 855.)

Mines and Minerals—Transfer of Interests in Proposed Corporation Held Consideration for Transferee's Purchase of Property of Greater Value for the Corporation.

1.  Where a party interested in the proposed corporation to take over and develop a mining claim desired to obtain a controlling interest in the corporation, the agreement of the other parties interested to surrender to him a portion of their interests was sufficient consideration for his agreement to purchase other mining claims and transfer them to the proposed corporation, though . the cost of such claims exceeded the proportion of the agreed value of the original claim surrendered to him.

Fraud — Allegations must Show Knowledge of Falsity in Reliance Thereon.

2. An allegation of fraud is not sufficient, where it is not averred that the parties making the misrepresentations knew their statements were false, or that the statements were relied on.

Mines and Minerals—Purchaser, Inspecting Property, cannot Claim Reliance on False Representations.

3. A purchaser of an interest in a mining claim, who personally inspected the property before making the purchase, cannot claim that he relied in making the purchase on false representations as to the quantity and availability of the water supply.

Mines and Minerals—Purchaser of Mine can Resell at Profit to Person Subsequently Interested Therein.

4. A party who had contracted for the purchase of a mine could thereafter resell it, at whatever profit he was able to make, to a person subsequently interested by him in the project, and who agreed to form a corporation for the development of the mine, since he dealt at arm's length with such person.

Mines and Minerals—Majority Stockholder in Mining Company Under Agreement to Develop Mine Held not Entitled to Charge Expenses Against Proceeds of his Unauthorized Sale Thereof.

5. Where a controlling stockholder in a mining company agreed to develop a mine, pledging himself to look solely to the profits resulting to reimburse himself for expenses, and renounced any lien or claim on the mine itself or his associates, giving them the option to contribute or not as they chose, and agreeing that the proceeds of the mining operations, after paying operating expenses, should be devoted to the payment for development, he cannot charge his expenses in the attempt to develop the mine on the proceeds of authorized sale thereof as a trustee.

Mines and Minerals — After Dissoluton It is Immaterial Whether Corporation or Stockholders are Beneficiaries of Trust Sought to be Enforced by Stockholders Against Majority Stockholder.

6. In a suit by stockholders against a controlling stockholder to account for the sale of mining claims held by him in trust for plaintiffs wherein it appeared it was the intention of the parties to form a corporation which should take the benefit of the trust, but that the corporation had been substantially abandoned, it was immaterial whether the trust was to be for the benefit of the corporation or its stockholders, since the stockholders were entitled to the net proceeds from the winding up of the corporation's asssets.

Mines and Minerals—Taxes Paid by Stockholder of Mining Company Held Proper Charge Against Proceeds of His Unauthorized Sale of Mining Property.

7. Taxes paid by the principal stockholder of a mining company on mining property are a proper charge in his favor against the proceeds of his unauthorized sale of the property, notwithstanding an agreement which prevented his charging the amount expended by him for development work against such proceeds.

**Mines and Minerals—Contract by Stockholder to Develop Mining Claims Held not to Require Completion of Development.**

8. A contract between the several stockholders of a mining company, reciting that the principal stockholder desired to develop the mining claims and agreed not to enforce his claim or lien for such development against the shares of the others, but to look to the profits for his expenditures, did not require such stockholder to complete the development.

**Mines and Minerals—Stockholders Suing Another for Accounting Held not Entitled to Recover Shares Surrendered in Consideration of Transfer to Company by Defendant.**

9. Stockholders of a mining company, suing to compel an accounting by a stockholder who sold mining property held by him in trust for the corporation, and which he agreed to develop, could not recover the shares in the company which they surrendered in consideration of defendant's transfer of property to the corporation, so that plaintiffs' interest in the amount due on the accounting should be computed accordingly.

**Interest—Not Chargeable Against Defendant Claiming Right to Retain Proceeds to Repay Advancement.**

10. Interest is not chargeable against recovery from the principal owner of a mine of the portion of the proceeds of the sale of the mine retained by him which belonged to plaintiff prior to the date of the judgment against him, where he claimed the right to retain the proceeds of the sale to repay advancements made by him for development of the mine.

From Multnomah: ROBERT TUCKER, Judge.

Department 2.

MODIFIED.  REHEARING DENIED.

For appellants there was a brief over the names of *Mr. John H. Hall* and *Mr. Jesse Stearns,* with an oral argument by *Mr. Hall.*

For respondent there was a brief and oral argument by *Mr. Jay Bowerman.*

BURNETT, C. J.—This is a suit by the plaintiffs Grady and Hall, representing themselves to be owners respectively of a one-fourth and a one-eighth interest in the capital stock of the Klamath Flume & Mining Company, and suing for the benefit of themselves

and such other parties in interest as may ask to be made plaintiffs, to require the defendant to account to them for the purchase price which he received in selling three tracts of mining property in Siskiyou County, California. For convenience these tracts will be called "Williams Point," "Sunnyside" and "Hendrickson" mines, said to be the property of the company but held by the defendant in trust for the stockholders of that concern.

Speaking generally, in addition to what is already noted the complaint says that in February, 1902, the corporation was the owner of the three tracts and on that date the defendant as president, and another, acting as secretary of the corporation, conveyed all of the property to one T. J. Nolton as trustee for the stockholders of the company and afterwards the defendant caused Nolton, trustee, to convey the property to the defendant under like trust, without any consideration therefor having been paid; and that subsequently on May 6, 1911, the defendant and his wife without the knowledge or authority of the plaintiffs sold the property to one Burbank, of San Francisco, California, for $17,000 in cash, which the defendant retains and for which he fails and refuses to account to the plaintiffs or either of them. The plaintiffs claim that there is due from the defendant to Grady $4,250 and to Hall $2,125, together with interest from May 6, 1911.

The complaint is challenged in material particulars. As to the trusteeship, the answer admits that the property was conveyed to Nolton in trust and that the defendant took title from Nolton in trust, but as trustee for the corporation and not for the stockholders as the complaint alleges. It is also admitted that the defendant sold the property to Burbank and

received $17,000 for the same. In substance, the answer states affirmatively that in the latter part of the year 1896 or early in the year 1897 the plaintiff Grady and one McArdle represented to the defendant that there was certain mining ground in Siskiyou County, California, containing valuable mineral deposits, which could be worked by a method of placer mining and the use of hydraulic giants, the water necessary for operation to be obtained in quantities in excess of 4,000 miner's inches by bringing the same in flumes not longer than twelve miles; that they had contracted to buy said property from Nolton, who in turn had arranged to purchase it from the original owners, who then lived in Kentucky; and that Nolton was buying the property for $5,000 and would sell it to the defendant and Grady, McArdle and such others as should associate themselves with them for $10,000 in money and a one-tenth interest in the property, said interest to be exempted from contributing anything to the expense necessary to bring the water or to operate the mine. The property to be acquired through Nolton was the Williams Point mine. It is further charged that it was agreed between Nolton, Grady, McArdle, Hall and this defendant that they would form a corporation for the purpose of taking over said property; that they would purchase the same from Nolton for $10,000 cash and own it in the following proportions: Day, fifty eightieths; Hall, six eightieths; McArdle, eight eightieths; Nolton, eight eightieths; and Grady, eight eightieths; and that the parties named were to pay Nolton the sum of $10,000 for the land mentioned, in proportion to their ownership therein, of which the defendant paid his full contribution, but he alleges on information that Grady did not pay anything at all, and that the plaintiffs had increased the price of

the land to the defendant without his knowledge, so that he was compelled to and did pay not only his proportionate share of the purchase price, but more than the entire purchase price, while Grady did not contribute anything at all towards the purchase of the property. It is said that the land was secured and conveyed to McArdle in trust to be held for said purchasers in the interests as stated before, and that McArdle contracted with the corporation to convey to it said real estate and mining claims in consideration that shares in the property should be issued in the proportions mentioned. As stated this applies only to the Williams Point mine. As to the other claims, the answer avers in substance that they were purchased by the defendant for the sum of $2,000 each and title taken in the name of McArdle and afterwards by him conveyed to the corporation. Continuing, the answer narrates in substance that after the properties had been purchased, the defendant, at the instance and request of the corporation, as well as the plaintiffs herein, went upon said property and undertook the development thereof, for which purpose he expended at least $18,000, when it was discovered that instead of there being water to the amount of 4,000 miner's inches the year around as represented by Grady, the supply ran down to 900 inches, and that instead of bringing it twelve miles, it was necessary to bring it over thirty-five miles, so that the expense was prohibitive, and by mutual consent the undertaking was abandoned. The defendant says that he paid all the taxes and carrying charges of the property, amounting to $250 and more, and that he has never received any part of the $18,000 mentioned or the $250 except the $17,000 received as the price of the property on the sale by him

to Burbank. All of these transactions occurred in the latter part of 1896 and 1897.

After traversing the answer in certain material particulars the reply alleges that about January 27, 1897, Grady, McArdle and Nolton each owned a one-fourth interest in the Williams Point mine, and the plaintiff Hall a one-eighth interest; that Day was desirous of acquiring an interest in the claim, which was valued at $10,000, but that he insisted upon having a controlling interest and agreed that if the other owners would transfer to him a sufficient amount of their stock, he would finance and develop the mine, paying the balance of the purchase price of the property, which was then unpaid, and that he would acquire two other properties described in his answer and convey them to the corporation. The plaintiffs then say that under these circumstances an agreement in writing was entered into between the defendant on one hand and McArdle, Nolton, Grady and Hall on the other, the parties to the contract constituting all the stockholders of the corporation, which contract provided for the development of the mine. It is pleaded according to its legal effect, in the reply, but for convenience is here set down in full:

"This agreement, made and entered into at Portland, Oregon, this 7th day of January, A. D. 1897, by and between I. N. Day, party of the first part, and L. D. McArdle, T. J. Nolton, H. C. Grady, W. L. Boise and John H. Hall, parties of the second part,

"Witnesseth: That whereas all of said parties hereto are stockholders in the corporation formed on the *27th* day of January, A. D. 1897, for the purpose of developing placer mines in Northern California, known as the Klamath Flume & Mining Company, and

"Whereas the party of the first part owns and controls the majority of the capital stock of said cor-

poration, and that by virtue of the laws of the State of California the said I. N. Day would be empowered to develop said mines belonging to said corporation and to hold a lien on the shares of stock and interests in said mines belonging to the said parties of the second part, in repayment to him of the expense incurred in such development, and to foreclose their interests in said corporation and mines, and

"Whereas, it is now proposed by the said I. N. Day, party of the first part, to advance a sufficient amount of money for the building of flumes, water ditches, saw mills, buildings, sluice boxes, and other necessary apparatus for the working of the mine,

"It is, therefore, mutually agreed by and between parties hereto and especially upon the part of I. N. Day, that he will not create or claim any lien upon said mines or property connected therewith, or upon the shares of stock or interests of the said parties of the second part for any sum or sums of money that he may advance in the development of said mines, or take advantage of the laws of the State of California for that purpose.

"And it is further mutually agreed by and between the parties hereto, that said parties of the second part, save and except T. J. Nolton, will pay to the said party of the first part their proportionate share as their interest may appear of costs of the development of said mine so long as they are financially able so to do, but a failure on their part to pay all their said proportionate share shall not give said party of the first part a right of action against them to recover the remainder, nor give him the right to file any lien or claim against their said shares of stock, or upon said mines.

"And it is further agreed that when said mine is in working operation, the proceeds thereof, if any there be, shall be applied,

"1st. To the payment of the running expenses in the operation of said mine;

"2nd. To reimburse the said I. N. Day for the moneys advanced by him in the development of said mine over and above his just proportion thereof;

"3rd. To the repayment of each and every one of the said parties hereto, except T. J. Nolton, in proportion as *their* interest may appear, the amount of money advanced by *them* for the development of said mine;

"4th. To the repayment of the purchase price of said mines to the parties hereto, except T. J. Nolton, in proportion to the amount of money advanced by them for said purpose.

"5th. That after all of said payments have been made out of the proceeds of said mine, the remaining proceeds, if any there be arising from the operation of said mine, shall be divided among the stockholders of said corporation in proportion to their respective interests.

"In witness whereof, we have hereunto set our hands and seals this 27th day of January, A. D. 1897.

"I. N. DAY.
"JOHN H. HALL.
"H. C. GRADY.
"L. D. McARDLE.
"W. L. BOISE.
"T. J. NOLTON.

"In presence of:

"_____,
"_____.""

It may be said in passing that, as conceded by all parties; the defendant Day was the owner, under the new arrangement, of forty-nine of the eighty shares into which the capital stock was divided, and W. L. Boise was the owner of one share, but that the same really belonged to Day. Under these circumstances the fifty shares will be treated as exclusively the property of Day. The plaintiffs say in their reply that in pursuance of the contract Day acquired the two properties known as the Sunnyside claim and the Hendrickson claim, caused them to be transferred to the corporation and afterwards proceeded to develop the mine but failed to carry out the undertaking; and

they claim, therefore, that he is not entitled to retain the shares which they surrendered in the original Williams Point claim, in order to give him the controlling interest in the consolidation of the three mines, and hence that they should be remitted to their original holdings; wherefore, they claim according to the prayer of their complaint that he should account to Grady for $4,250 and to Hall for $2,125, that is to say: to Grady one fourth and to Hall one eighth of $17,000.

The principal question in dispute is substantially this: The plaintiffs claim that the expenses incurred by the defendant in his attempt to bring water into the mine and to develop the property were by agreement of the parties to be liquidated by the proceeds of the development of the mine and not from the *corpus* of the mine itself, while the defendant claims that those expenses, amounting as he says to $18,000 and upwards, were a direct charge against the corporation and a proper counterclaim against the $17,000 purchase price which he received from Burbank.

There is some controversy about whether the contract already quoted was executed or not. The corporation as time progressed fell into innocuous desuetude, and the defendant testifies that it was dissolved. It is without dispute that no shares of stock were issued. McArdle was for a long time secretary of the concern but claims to have turned over all the books and papers to the defendant, to whom McArdle sold his interest, and who, it is conceded, owned a majority of the stock. Notice was served upon the defendant to produce the original contract, but he was unable to do so and a copy thereof was produced and early in the hearing was offered and read in evidence without objection. Later on in the testimony the defendant, while not denying explicitly that

he had signed the contract, claimed not to remember having signed it, but other witnesses testified that he did sign the same. The preponderance of the evidence is clearly in favor of the contention that the contract was executed as already quoted. Taking this as an established fact, what construction is to be placed upon it?

The agreements of the defendant in that instrument are purely negative, to the effect that he will not create or claim any lien upon the mines or property connected therewith, or upon the shares of stock or interest of the other parties for any sum of money that he may advance in the development of the mine. As to the agreement by the other parties except Nolton that they will pay their proportionate share of the cost of developing the mine so long as they are financially able to do so, we note that it is expressly stipulated that a failure on their part to pay all their proportion shall not give Day a right of action against them to recover the remainder, or any right to file a claim or lien against their stock or upon the mine. Taking these two conditions together, the legal effect of the contract is that they had an option of joining with Day in the development of the mine, but that they could not be compelled to do so. It is manifest that the intention of the parties was that Day should finance the mine and from the proceeds thereof he should first pay the running expenses; second, reimburse himself for the development expenses; third, reimburse the other parties except Nolton for their expenses in the development; and next, pay to all except Nolton what they had advanced towards the purchase price. If these things had been accomplished up to that point, the remainder of the net proceeds would have been so much profit out of the operation of the mine. The exception of Nolton

from all these things is based upon the unquestioned fact, hitherto not mentioned, that he sold only nine tenths of the mine to McArdle in the first instance, reserving one tenth to himself, with the condition that he was not to be liable for any of the expenses connected with the mine.

The defendant contends that he was duped in the first place by McArdle and Grady in their representation that the mine would cost $10,000. The testimony shows, however, that Nolton had an option to buy the mine for $5,000 from some heirs of a former owner who lived in Kentucky, and that his realization of the option depended upon the settlement of the estate of the former owner then deceased. At this stage McArdle became interested in the mine and contracted to buy it from Nolton on perfection of his title, paying him a small amount of earnest money. McArdle returned to his home in Portland after an inspection of the mine and in conversation with Grady, his next-door neighbor, the latter became interested and acquired a one-fourth interest in McArdle's share, which he had obtained from Nolton, that is to say, one fourth of the nine tenths of the mine which Nolton conveyed to McArdle. Afterwards McArdle sold to the plaintiff Hall a one-eighth interest on the basis of $10,000 valuation, for which Hall paid McArdle $1,250. About this time, whether before Hall acquired his interest or afterwards is not clear or material, Day became interested in the proposition from representations made by McArdle respecting the Williams Point mine. He went upon the ground and made personal examination of the same, securing specimens of the gold, and agreed to buy an interest therein on the basis of the $10,000 valuation. Subsequently the corporation was formed.

During the negotiations Day proposed to furnish the money to finance the development of the mines, provided he was given the controlling interest in the stock. At that juncture Nolton had eight eightieths; Grady, twenty eightieths; Hall, ten eightieths; McArdle, twenty eightieths; and Day, twenty-two eightieths of the Williams Point mine. The contention of the plaintiffs is that Day was to acquire the other two mines and turn them into the corporation in consideration of their surrendering some of their stock. It appears that Grady surrendered twelve of his twenty eightieths, leaving him eight eightieths; Hall, four of his ten, leaving him six eightieths; and McArdle twelve of his twenty, leaving him eight eightieths, forming what may be termed a bonus of twenty-eight eightieths abandoned or surrendered to Day, which added to the twenty-two eightieths he already possessed made him the holder of fifty shares. During the progress of the acquisition of the property, according to the written evidence, McArdle made a declaration of trust to Day, Grady and Nolton and such others as might take an interest in the corporation to be formed, covering the Williams Point mine, the Evans & Poblette (Sunnyside) claim and any other property he might acquire for the corporation. About the time the corporation was formed, McArdle addressed to it a proposition, reciting his ownership as trustee of the Williams Point and other mines, including those here in question, in trust for Day in the proportion of forty-nine eightieths; Boise, one eightieth; Hall, six eightieths; Nolton, eight eightieths; McArdle, eight eightieths; and Grady, eight eightieths; and offering to sell the same to the corporation for $800,000, taking in payment therefor stock to be issued to his *cestuis que trustent* in the proportion already mentioned.

There are in evidence the minutes of a meeting of the corporation held January 28, 1897, at which were present Day, McArdle, Grady, Hall and Boise, which meeting was presided over by Day as president of the corporation, which minutes set forth and quote the McArdle proposition already mentioned and state that it was unanimously accepted. This written evidence, offered by the defendant himself, is clearly confirmatory of the theory of the plaintiffs that part of the transaction was that Day should acquire the other mines in question and put them into the pool in consideration of the surrender of some of their shares in the Williams Point mine.

1. Day had already acquired twenty-two eightieths of the Williams Point mine, on a basis of $10,000 for the whole mine. This would amount to $2,750. Under the new arrangement, involving the surrender of a portion of the holdings of the other parties to the transaction, he acquired an additional block of twenty-eight eightieths, amounting to $3,500, which while not equal in value to the amount of money he claims he paid for the two mines, is a sufficient consideration to support his transfer of those properties to the concern, amalgamating them with the Williams Point mine.

2. The element of fraud intimated in the answer is not sufficiently stated as a matter of pleading, in that it is not averred that Grady and McArdle knew their statements about the availability of water to be false, or that Day relied thereon.

3. Moreover, having made personal examination of the situation for himself, Day comes within the rule of the similar case of *Wimer* v. *Smith,* 22 Or. 469, to the effect that a party seeking relief on the ground of fraud perpetrated upon him by means of false

104 Or.—23

representations must not only clearly prove the fraud, but must also show that he relied upon the false statements; and although such false representations were made as alleged, yet, if having full means of knowing the truth he acted on his own judgment in the transaction from which he seeks relief, he cannot complain. The result is, that Day must be held to his transfer, through McArdle as trustee, of the two additional tracts amalgamated with the original Williams Point mine. It is supported, as we have shown, by a sufficient consideration.

4. As McArdle acquired the Williams Point mine independently of Day and before approaching the latter on the subject, he had the right to raise the price of the mine and sell to Day as dearly as he could. He owed no fiduciary duty to Day and they dealt at arm's-length on personal examination which Day made of the property. That McArdle and Grady sold the Williams Point mine at a profit sufficient to pay their proportion of the new venture involved in the organization of the corporation cannot vitiate the transaction. As the event indicates, Day may have paid too dearly for his venture, but the case does not present features upon which any relief in that respect can be granted him.

5. Still further, after he acquired a majority of the stock under the new arrangement, he chose to develop the mine but pledged himself to look solely to the profits resulting from the development, to reimburse himself for the expenses incurred. He expressly renounced any lien or claim upon the mine itself or upon his associates in the corporation. He allowed them what was really an option to participate in the work of developing the mine; but it was only in legal effect an option, because he divested himself of any right to compel them to contribute.

The proportional interest of the parties in the mine itself was not disturbed or affected by the arrangement under which Day operated in the development scheme. Confessedly, he acquired the title of the property from Nolton in trust, with knowledge of all the facts. He had no authority to sell the *corpus* of the mine and divert the proceeds of the sale to the satisfaction of his expenses in attempting to develop the mine.

6. Under the circumstances of the substantial abandonment of the corporation it cannot matter whether he took the title in trust for the corporation or for its stockholders. The result is the same. In the ultimate winding up of any corporation the net proceeds of its property go to the stockholders in proportion to their holdings.

7. All the claim Day makes in this case against the fund, aside from taxes, is based upon his expenses incurred under the arrangement already quoted, in developing the mine. He alleges that he has expended $250 and more for taxes. How much more is not stated. The evidence shows the expenditure of at least that amount. This was for the benefit of the property itself and is a proper charge to be deducted from the $17,000 which he received from Burbank as the purchase price of the three mining tracts. The other charges must be excluded from the calculation for reasons already stated.

8. On the other hand, the agreement quoted does not bind Day to any degree of development of the mine or to bring water upon the claims. The practical construction of that contract is that Day had the option of experimenting with the mine and making it pay for the expense, also the purchase price, and make a profit if he could but not under compulsion.

9. The plaintiffs cannot recover the shares which they surrendered in consideration of Day's transfer of the two tracts and their amalgamation with the Williams Point mine. The result is, that after deducting $17,000, the selling price received by Day from Burbank, the $250 paid as taxes, there is a balance of $16,750 in Day's hands, of which the plaintiff Hall owns six eightieths and the plaintiff Grady eight eightieths. In other words, there is due from the defendant Day to Grady $1,675 and to the plaintiff Hall $1,256.25.

10. Interest cannot be allowed in this case: *Sargent* v. *American Bank & Trust Co.*, 80 Or. 16 (154 Pac. 759, 156 Pac. 431).

A decree will be entered against Day and in favor of the plaintiff Grady for $1,675 and in favor of the plaintiff Hall for $1,256.25. The decree of the Circuit Court is modified accordingly.

MODIFIED. REHEARING DENIED.

BEAN, RAND and McCOURT, JJ., concur.