Argued October 25, 1948; modified and remanded January 25, 1949

## LEWIS *v.* SHOOK, AND LEE ET AL.

### 201 P. (2d) 908

*Harold Banta,* of Baker, argued the cause for appellants. On the brief were Hallock, Donald, Banta & Silven, of Baker.

*P. J. Gallagher,* of Ontario, argued the cause for

respondents Chriss Lee and Ethel Lee. On the brief were Anthony Yturri and Gallagher & Gallagher, all of Ontario.

Before ROSSMAN, Chief Justice, and LUSK, BELT, BAILEY and HAY, Justices.

HAY, J.

This suit was instituted by Charles S. Lewis and his wife against R. D. Shook and his wife, Chriss Lee and his wife, and A. S. Grant, Trustee, the plaintiffs seeking a declaratory judgment respecting the rights and status of the parties under two contracts for the sale of real property.

The first contract was dated June 14, 1946, between Chriss Lee, as vendor (his wife consenting and agreeing to join in any instrument of conveyance to be executed pursuant to the contract), and R. D. Shook, as purchaser, for the sale of 4,000 acres of land, more or less, in Baker County, and for the transfer to the purchaser of all grazing leases, permits and other rights to graze livestock upon the public domain in two certain townships in Baker County, held by the vendor

individually, or by vendor and purchaser jointly under what they termed the Shook-Lee joint allotment. The agreed price was $28,000, payable $15,000 on execution of the contract and the remainder upon tender by vendor of a good and sufficient warranty deed with a title insurance policy in the amount of the sale price. It was agreed that, if desired by the purchaser, the title insurance would be written in two separate policies, one covering such portion of the land as the purchaser wished to retain, and the other covering such portion as he might contract to sell to a third party.

The second contract was between Shook and his wife, as vendors, and Lewis and his wife, as purchasers, dated June 15, 1946, for the sale of 3,000 acres, more or less, of the land comprising the subjects of the Lee-Shook contract, together with certain of the grazing rights included in that contract. This contract was made conditioned upon completion of the Lee-Shook sale. The agreed price was $23,000, payable $11,000 within three months and the remainder within six months from date.

As the wives of the respective parties have not been active in the controversy, we think that it will simplify the discussion if we refer to Lewis, Shook and Lee as if they were the sole actors therein.

The complaint alleged as follows: Lewis was "inexperienced in the raising and grazing of cattle and with grazing and timber lands". About November 1, 1945, he purchased a ranch and cattle in Baker County. He found that it would be necessary for him to secure additional grazing lands. Shook, who also needed additional grazing lands, learned that Lee had grazing lands for sale. Shook informed Lee that he thought that he

could "work out a deal" with Lewis whereby Shook would purchase the Lee lands, "and at the same time and as a part of the same transaction turn the largest portion thereof" to Lewis. Lee and K. W. Kivett, his agent, made to Shook certain statements concerning the land, and authorized him to communicate such statements to Lewis as emanating from Lee. Such statements were: (1) That there was growing upon certain tracts of said lands not less than two million feet of good, merchantable pine timber; (2) that in the southwest corner of "said tract", there was " a large spring capable of watering all of the livestock which the adjoining grazing lands, which they proposed to sell, would carry"; and (3) that there were no contracts outstanding upon said tracts of timber, that all the grazing lands were enclosed by fences, and that none were fenced in by other persons (with one exception not material herein). These statements were communicated in due course by Shook to Lewis. Thereafter both Lee and Kivett informed Lewis that there was "conservatively not less than two million feet of good, merchantable pine timber growing" upon the lands, and Lee himself informed Lewis that he had recently completed a survey of the premises, that the above-mentioned spring was located thereon and belonged to Lee, and that all of the lands were "properly enclosed in fences belonging to Lee." Shook and Lee, on or about June 14, 1946, entered into the Lee-Shook contract. Lewis, acting and relying upon the above representations, entered into the Shook-Lewis contract. At the time when the Lee-Shook contract was executed, it was explained to Lee and to his agent Kivett that, "simultaneously therewith", Shook "was going to enter into" the Shook-Lewis contract, "and all of the parties fully understood how said sale was to be consum-

mated''. (The contracts are pleaded according to their legal effect, and copies thereof are attached to the complaint as exhibits.) The Shook-Lewis contract provided that Lewis should have the right, ''after completion of the Lee contract'', to sell and dispose of the timber upon the premises, delivering the proceeds of such sale to Shook to be applied on the purchase price, and, after the latter contract was executed, Lee informed Lewis that he was ''free to at once sell and dispose of said timber''. Lewis mortgaged his ranch and cattle to Shook to secure payment of the purchase price due under the Shook-Lewis contract. Subsequent to the execution of that contract and of his mortgages securing the purchase price thereunder, Lewis learned that Lee had theretofore contracted to sell the timber on the premises to persons named Hobson and Gwilliam, who were claiming the right ''to continue to cut and remove said timber'', and Lewis learned, moreover, that the spring above referred to was not located upon the premises. There is no other water available for the watering of livestock upon the lands, and their value is far less than it would have been if the spring had been thereon. Lewis was informed by Lee that, several weeks after the Shook-Lewis contract was signed, Lee caused the timber upon the premises to be cruised, and that the cruise disclosed that the quantity of merchantable pine timber did not exceed 105,000 feet. A tract of 320 acres and another of 100 acres of the premises have been enclosed inside the fences of other persons. A controversy has arisen between the parties to said contracts, as follows: Lewis contends that he is not obligated to make any payment under the Shook-Lewis contract until such time as Lee is in a position to be able to perform the Lee-Shook contract. Lewis contends further that Lee's statements relative

to the quantity of good, merchantable pine timber upon the premises were statements of fact; that such statements were false, and were known to be false at the time they were made; that they were made for the purpose of misleading Lewis; and that Lewis had a right to rely thereon and has been defrauded thereby. Similar allegations are made respecting the alleged misrepresentations with reference to the location of the spring and as to the fences. Lee contends that he made no statements relative to the timber, the fences, or the location of the spring. Lee has failed to perform the Lee-Shook contract; there has been a delay in the completion thereof and Lee has been unable to convey marketable title to the lands and timber and to the spring. Such failure of performance is so substantial as to render completion of the transaction impossible and impracticable. Lee contends that his inability to perform is inconsequential, but that he is willing to rescind the Lee-Shook contract. Shook is unwilling to rescind either of the contracts, and claims that Lee's failure of performance is substantial and that he has been greatly damaged thereby. A declaration was sought that, by reason of the misrepresentations referred to, Lewis had a right to elect either to rescind the Shook-Lewis contract or to affirm it subject to a reduction of the purchase price in the amount by which he has been damaged by such misrepresentations.

Shook answered, admitting generally, with some qualifications, the allegations of the complaint, and praying for a declaratory judgment as to the rights and liabilities of all of the parties. Affirmatively, he alleged as follows: The two contracts comprised one transaction. Lee understood that Shook did not desire or need for himself the entire area which he agreed

to purchase, but only 1,000 acres thereof, together with certain range rights, and that he would turn the remainder to some other person. Lee desired to sell his lands in a body. Lewis was unable to finance his part of the deal, and Shook finally agreed to and did put up all the money and purchased the entire property, taking mortgages on Lewis's ranch and cattle to secure payment of the sale price under the Shook-Lewis contract. There is in fact, in Shook's opinion, much more than 105,000 feet of merchantable timber upon the premises. The lands are grazing lands, are being acquired by Lewis primarily for grazing purposes, and the timber thereon is of secondary and incidental importance. As to the spring, its non-location on the premises affects the use of not to exceed 700 acres. Shook is ready, able and willing to perform both contracts, and is opposed to rescission on the part of either Lewis or Lee. Further, by way of counterclaim against both Lewis and Lee, Shook alleged: He has suffered "some damage" as a result of delay on Lee's part to perform his contract. If fraud be found to exist in respect of Lee's misrepresentations, he will suffer further damage. The amount of such damage will depend upon the facts as found by the court and upon the extent to which Lee may hereafter be able and willing to perform. The amount of damages inuring both to Lewis and to Shook should be determined and should be deducted from the purchase prices under the respective contracts. In the event that the court should find that Lewis is entitled to a rescission of the Shook-Lewis contract, Shook will suffer great loss and injury through the acts and defaults of Lee "authorizing" such rescission. He asks the court to determine the amount of "such damages", to direct a reduction of the purchase price under the Lee-Shook contract on

account thereof, and, subject to such reduction, to decree specific performance of such contract.

Lee, while admitting execution of the contracts, denied generally the other allegations of the complaint. He alleged as follows: He has been and is ready, able and willing to perform the Lee-Shook contract on his part. There is a balance of $13,000 remaining due from Shook to Lee under such contract. Contemporaneously with the filing of his answer, he tendered to Shook a good and sufficient deed of conveyance and a policy of title insurance, as provided in the contract, and demanded payment of the balance due. In the event that payment is not made within such reasonable time as may be fixed by the court, he asks for strict foreclosure of the contract.

Replying to Shook's answer, Lee specifically and categorically denied having made any misrepresentations as alleged therein, and denied that either Shook or Lee has suffered or will suffer any damage on account of anything done or any statement made by Lee. Affirmatively, he alleged that he has performed his agreement with Shook, and that he is ready to deliver a deed and title insurance on payment of the balance of the purchase price. He alleged further that Shook has entered into possession of the lands agreed to be sold, and intends to withhold payment of the purchase price "for an indefinite and prolonged period of time", to Lee's damage in the loss of the use and benefit of the money.

After a hearing, the trial judge delivered from the bench an opinion as to the facts and the law. This opinion was later modified by a written memorandum opinion made and filed. Under such modified opinion, the court held that Lewis was entitled to a rescission

of the Shook-Lewis contract, and that Lee was entitled to specific performance of the Lee-Shook contract. Findings of fact, conclusions of law and a decree, in accordance with the modified opinion, followed, and Shook has appealed.

During the pendency of the appeal, Lewis moved this court to dismiss the appeal as to him, on the ground, among others, that Shook, since the date of the decree, had acquiesced therein by leasing to a stranger a portion of the lands covered by the Shook-Lewis contract. The motion was allowed. *(Lewis v. Shook et al.,* Or. 188 P. 2d 148.) Lewis, therefore, is eliminated from the case, and the appeal stands between Shook, as appellant, and Lee, as respondent.

Lee, at the beginning of the case, moved to strike Lewis's complaint on the ground that it stated no issue cognizable under the declaratory judgments procedure. The motion was denied. He then demurred to the complaint on the same ground, and also upon the general ground of insufficient statement of facts to constitute a cause of suit. The demurrer was overruled. He contends that either the motion or the demurrer should have been sustained, as Lewis had a remedy at law against Shook. He grants, however, that a liberal interpretation of the declaratory judgments statute may have justified the court in overruling the demurrer. In this connection, it is to be observed that the act itself requires that it be liberally construed and administered. Section 6-612, O. C. L. A. Now that Lewis is out of the case, however, Lee suggests that no issue, within the scope of the declaratory judgments law, remains for consideration by the court.

■ It is proper to remark, at this point, that Lewis was not actually "out of the case" until the appeal,

as to him, was dismissed by this court. He was a party when the decree was rendered, and the dismissal of the appeal as to him did not vitiate the decree or affect the rights and liabilities of the other parties, as to each other, with which rights and liabilities alone the appeal is now concerned.

■ Lee, by his brief in this court, raises these questions as against Shook: (1) There is no fact alleged by the pleadings upon which damages for fraud may be allowed; (2) as to such damages, Lee is entitled to trial by jury; (3) procedure under the declaratory judgments statute may not be used for what is in effect an ordinary damage action, especially one based on fraud. In view of our disposition of the case, we find it unnecessary to discuss any of these questions, except for (3). As to that, the elimination of Lewis from the case converts the issues, as between Shook and Lee, into what amounts to a suit for specific performance by Lee, with a counter-claim by Shook that he is entitled to damages, to be applied in reduction of the purchase price, in respect of Lee's alleged fraudulent representations. In praying for a decree of specific performance, Lee submitted to the equitable jurisdiction of the court, and cannot now urge the jurisdictional question. *Oldenburg v. Claggett,* 142 Or. 238, 241, 20 P. 2d 234; *Bottemiller v. Ball,* 130 Or. 255, 262, 279 P. 542, 69 A. L. R. 951; *Jensen v. Probert,* 174 Or. 143, 158, 148 P. 2d 248; *Mogul Transportation Co. v. Larison,* 181 Or. 252, 259, 181 P. 2d 139.

■ Mr. Lee takes the position that Shook was as familiar with the land involved as he was, and, therefore, that it was incumbent upon Shook not only to prove that Lee made the alleged fraudulent representations but also that Shook relied thereon. It would

be inequitable to grant Shook relief in respect of the alleged misrepresentations if in fact he was not deceived thereby, but, having known the truth, acted upon his own judgment. *Grady v. Day,* 104 Or. 340, 353, 206 P. 855. The principal misrepresentations asserted were with reference to the amount of merchantable timber upon the land and with regard to the location of the spring. Lewis testified that the first time that Shook communicated to him Lee's alleged misrepresentations regarding the amount of timber on the land was about May 15, 1946. Shook testified, however, that the first time Lee made any statement to him in that regard was about two weeks later. Shook had been acquainted with this 4,000-acre tract since 1903, had grazed cattle upon it, and had ridden over it many times. He knew, in a general way, the location of the spring. He began negotiations with Lewis in an effort to interest him in a joint purchase of the land about the middle of May, 1946. He himself had had some discussions with Lee looking toward acquiring the land as early as 1942, and Lee had promised to give him the "refusal" of it if he decided to sell. Lee argues from those facts that Shook made the representations to Lewis about the timber before Lee had made any statements to him on the subject. Lee denied that he had ever made any statements to either Shook or Lewis about either the amount of timber or the location of the spring. Miss Kivett, who apparently acted as agent for Lee, denied that she had told either Lewis or Shook anything about the amount of the timber. There was some evidence indicating that, pending the negotiations between Lee and Shook, (actually about May 16, 1946), Lee received an inquiry from a third party indicating that such third party was interested in acquiring the land, and

asking him what the land consisted of and "what kind of a deal" he would make. On the basis of this inquiry, Lee informed Shook, through Miss Kivett, that he had raised his price $2,000, and it is contended that Miss Kivett, at that time, told him that the $2,000 represented the value of the timber, from which it is argued that Shook must have known that there was very much less than two million feet of merchantable timber on the land.

Although Shook may not have had a great deal of experience with timber, he had been familiar with this particular timber for more than forty years. He appears to be a successful rancher and stockman. He must be at least reasonably intelligent; in fact, judging from the quality of his testimony, we think that he is highly intelligent. At the current stumpage prices of pine timber, we find it difficult to believe that he was not aware that there was no such body of timber on a ranch adjoining his own as one of two million feet of merchantable pine. He may not have been able to make any close estimate of the footage, but that he should have been so grossly mistaken as he claims seems to us to be improbable. The existence of a tract of two million feet of good pine timber in Baker County would be a matter of fairly common knowledge in the community. In our opinion, Mr. Shook failed to establish by the necessary preponderance of the evidence the fact that he was deceived by Lee's representations in this regard.

Similar considerations, we think, are applicable to the question of whether or not Shook was deceived by any representations that may have been made by Lee respecting the location of the spring. The evidence is that the spring is upon land near the boundary of

the Lee land but within the fences of an adjoining ranch known as the Schuck place. Shook knew where the spring was, and that it was located close to the Schuck house and inside the Schuck fence. He knew, moreover, that the spring watered an orchard and garden on the Schuck place. He insisted, however, that he did not know whose fence inclosed the spring, but he was sufficiently familiar with the place to know that the spring was within one of the fences inclosing the Schuck land.

The location and ownership of springs of water upon range land in eastern Oregon is a matter of vital importance to local stockmen. Mr. Shook had run cattle over this particular range for many years. The trial judge's finding that he was not deceived as to the location of the spring by any representations of Lee is in accord with our own view of the evidence.

At the conclusion of the case, the trial judge delivered an opinion orally from the bench. He held that Shook had established by a preponderance of the evidence that Lee had made to him the misrepresentations herein referred to regarding amount of timber and location of spring. A few days later, the judge made and filed a memorandum opinion in writing, from which it appeared that, since delivering his oral opinion, he had come to a different conclusion as to the weight of the evidence in certain particulars. This change of opinion, it is suggested, was brought about by the judge's acceptance of Lewis's testimony that Shook's representations were made to him about May 15, 1946, whereas Shook's own testimony showed that Lee made no representations to him about the matters in question until about two weeks after that date. Counsel point out that the evidence indicates that Lewis's testimony re-

garding exact dates was unreliable. Moreover, there were allegations in the complaint that, subsequent to the time when Shook made the representations to Lewis, as coming from Lee, Lee himself, and also Miss Kivett, represented to Lewis that there was two million feet of timber on the land, and that Lee, after the Shook-Lewis contract was entered into, assured Lewis that the spring was located on the lands. Upon these allegations, the evidence was conflicting, and the court made no findings thereon.

Whether or not the judge placed too much reliance upon Lewis's testimony as to exact dates, it appears that what was perhaps the most important change in his opinion was that in which he held that Shook and Lee were equally familiar with the lands, and that Shook had failed to establish that he was deceived by Lee's representations. This conclusion was contrary to the judge's original views as expressed in his oral opinion, but it was the judge's right and duty, if, on further consideration, he felt that his oral opinion was erroneous, to give expression to his ultimate determination, and to make his formal findings in accordance therewith.

■ The court found that Lee had tendered to Shook a good and sufficient warranty deed conveying the premises. The tendered deed is in evidence. Its description omits 120 acres of land included in the contract. The deed, therefore, was insufficient. Title insurance, as called for by the contract, had not been furnished, nor had any assignment, waiver or transfer of range rights been tendered. Under the circumstances, we think that the court erred in decreeing specific performance of the contract.

We are requested to declare the rights and status of the parties with respect to damages for delay in

performance of the contract. The evidence, in our opinion, is not sufficient to enable us to determine whether or not Mr. Lee was chargeable with unreasonable delay in the premises.

The decree will be modified by eliminating therefrom that portion thereof which declares that Lee has tendered to Shook a good and sufficient warranty deed conveying the premises. The cause will be remanded for the purpose of permitting Lee to comply with his contract, within a reasonable time, by tendering a good and sufficient warranty deed conveying the lands, together with title insurance, and assignment, waiver or transfer of grazing rights, as provided for by the contract, and for such further proceedings, not inconsistent with this opinion, as may be necessary. No costs will be awarded to any party.